**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 22-20531-CIV-LENARD/LOUIS

OMEGRA SHIPPING PTE
LTD. OF SINGAPORE,

      Plaintiff,

**v.**

WORLD FUEL SERVICES
(SINGAPORE) PTE LTD.,

      Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT (D.E. 16)

**THIS CAUSE** is before the Court on Defendant World Fuel Service (Singapore) PTE LTD's ("Defendant") Motion to Dismiss the Amended Complaint, ("Motion," D.E. 16), filed May 13, 2022. Plaintiff Omegra Shipping PTE LTD of Singapore ("Plaintiff") filed a Response on May 27, 2022, ("Response," D.E. 20), to which Defendant filed a Reply on June 3, 2022, ("Reply," D.E. 21). Upon review of the Motion, Response, Reply, and the record, the Court finds as follows.

## I.   Background[1]

At all relevant times, Plaintiff was the time charterer of the *M/V FORTUNE IRIS*, a bulk carrier vessel flagged under the laws of Hong Kong, China (the "Vessel"), which is

---

[1]   Unless otherwise specified, the following facts are gleaned from Plaintiff's Amended Complaint, (D.E. 4), and are deemed to be true for purposes of ruling on Defendant's Motion.

owned by White Lilac Shipping S.A. (the "Owners").  (Am. Compl. ¶¶ 6-7.)  Defendant sells marine fuel.  (Id. ¶ 8.)

On September 10, 2021, Plaintiff and Defendant entered into a contract for the sale of marine fuel for the Vessel which was memorialized by a Bunker Sale Confirmation email (the "Marine Fuel Contract"), (id. ¶ 10), which Plaintiff attached to the Complaint. (D.E. 4-2.)  The Marine Fuel Contract incorporated the "WFS Marine Group of Companies General Terms and Conditions," (Am. Compl. ¶ 11), which Plaintiff also attached to the Complaint, ("WFS Terms and Conditions," D.E. 4-3).[2]

Defendant arranged for Sentek Marine and Trading Pte Ltd. ("Sentek") to supply and deliver fuel to the Vessel in Singapore on September 24, 2021 (the "Bunkers").[3]  (Id. ¶¶ 9, 12.)  Pursuant to Clause 6(b) of the WFS Terms and Conditions, samples of the marine fuel were supposed to be taken at the time the Bunkers were delivered to the Vessel and given to the receiving Vessel, the bunker tanker, the bunker surveyor, and the testing laboratory.  (Id.)  Pursuant to the Bunker Sale Confirmation, the Bunkers needed to meet the requirements for marine distillate fuels pursuant to the ISO 8217 2010 Fuel Standard. (Id. ¶ 13.)

---

[2]    "[A] document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed."  Horsely v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002) (citing Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999)). "'Undisputed' in this context means that the authenticity of the document is not challenged."  Id. (citations omitted).  Here, the WFS Terms and Conditions are central to Plaintiff's Amended Complaint, and its authenticity is not challenged.

[3]    "Bunker fuel (or 'bunkers') is synonymous with maritime fuel."  Barcliff, LLC v. M/V DEEP BLUE, IMO No. 9215359, 876 F.3d 1063, 1065 n.1 (11th Cir. 2017) (citing Bunker fuel, Webster's Third New International Dictionary, Unabridged).

On or about September 28, 2021, the Owners notified Plaintiff that the analysis of the sample with seal n. 4437256/A780024 (the "Viswa Sample") revealed that the Bunkers were off specification with respect to water, aluminum, and silicon levels found in the sample.  (Id. ¶ 14.)  The Viswa Sample failed to meet required specifications under the Time Charter between the Owners and Plaintiff, and therefore the entire supply of fuel from Defendant was unfit for use.  (Id.)

On or about October 27, 2021, a second sample with seal n. 4437253 – but with no counter-seal from the Vessel – that was purported by Defendant to be from the same sale and delivery was tested (the "Supplier Sample").  (Id. ¶ 15.)  The analysis of the Supplier Sample revealed that the Bunkers were on specification for water, aluminum, and silicon levels.  (Id.)

On or about November 2, 2021, the Owners made available for testing a sample with seal n. A780022 – but with no counter-seal from Sentek (the "1st CCIC Sample").  (Id. ¶ 16.)  The analysis of the 1st CCIC Sample revealed that the Bunkers were off specification for water, aluminum, and silicon levels.  (Id.)

On or about November 16, 2021, the Owners made available for testing yet another sample with Sentek's seal n. 4437251 (the "2nd CCIC sample") which was found to be off specification for water, aluminum, and silicon levels.  (Id. ¶ 17.)

The Owners and Plaintiff began to believe that the Supplier Sample came from a different source than the Bunkers supplied to the Vessel.  (Id. ¶ 18.)  On or about September 28, 2021, Plaintiff notified Defendant that the Bunkers did not meet the required

3

specifications, that they affected the normal operations of the Vessel, and that Plaintiff reserved all its rights and remedies as a result.  (Id. ¶ 19.)

Because the Bunkers were off specification, the Owners refused to consume them. (Id. ¶ 22.)  As a result, Plaintiff was unable to fix the Vessel from October 22, 2021, at 6:21 AM to November 25, 2021, at 12:01 AM (33.74 days) until the Bunkers were de-bunkered. (Id.)  In addition, the Vessel was forced to consume alternative sources of marine fuel to sail to Singapore and, subsequently, the Straits of Malacca to undertake de-bunkering operations.  (Id.)  Plaintiff also incurred significant costs to undertake testing of the various samples.  (Id.)  Once de-bunkered, the Bunkers were tested on November 24, 2021, and were again found to be off specification for water, aluminum, and silicon levels.  (Id. ¶ 23.)

Plaintiff states that it is liable under the Time Charter to pay to the Owners expenses relating to the Bunkers during the period in question, and claim to be entitled to seek indemnity, contribution, and damages from Defendant.  (Id. ¶ 24.)

On March 1, 2022, Plaintiff filed the operative Amended Complaint alleging claims for Breach of Contract (Count I), Negligence (Count II), Fraud (Count III), and Gross Negligence (Count IV).  (D.E. 4.)

On May 13, 2022, Defendant filed the instant Motion to Dismiss, arguing that each Count of the Amended Complaint fails to state a claim upon which relief can be granted. (D.E. 16.)

## II.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim for "failure to state a claim upon which relief can be granted."  "To survive a motion to dismiss,

a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).   Conclusory statements, assertions or labels will not survive a 12(b)(6) motion to dismiss.  Id.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.; see also Edwards v. Prime, Inc., 602 F.3d 1276, 1291 (11th Cir. 2010) (setting forth the plausibility standard).   "Factual allegations must be enough to raise a right to relief above the speculative level[.]"  Twombly, 550 U.S. at 555 (citation omitted).  Additionally:

> Although it must accept well-pled facts as true, the court is not required to accept a plaintiff's legal conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (noting "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").   In evaluating the sufficiency of a plaintiff's pleadings, we make reasonable inferences in Plaintiff's favor, "but we are not required to draw plaintiff's inference."  Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1248 (11th Cir. 2005). Similarly, "unwarranted deductions of fact" in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations.  Id.; see also Iqbal, 129 S. Ct. at 1951 (stating conclusory allegations are "not entitled to be assumed true").

Sinaltrainal v. Coca-Cola, 578 F.3d 1252, 1260 (11th Cir. 2009), abrogated on other grounds by Mohamad v. Palestinian Auth., 566 U.S. 449, 453 n.2 (2012).  The Eleventh Circuit has endorsed "a 'two-pronged approach' in applying these principles: 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they

plausibly give rise to an entitlement to relief.'" <u>Am. Dental Ass'n v. Cigna Corp.</u>, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting <u>Iqbal</u>, 556 U.S. at 679).

"In addition to the Rule 8(a)(2) requirements, Rule 9(b) requires that, for complaints alleging fraud or mistake, 'a party must state with particularity the circumstances constituting fraud or mistake,' although '[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'" <u>In re Galectin Therapeutics, Inc. Secs. Litig.</u>, 843 F.3d 1257, 1269 (11th Cir. 2016) (quoting Fed. R. Civ. P. 9(b)).

> While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth: (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff, and; (4) what the defendant obtained as a consequence of the fraud.

<u>Id.</u> (citations omitted). "The '[f]ailure to satisfy Rule 9(b) is a ground for dismissal of a complaint.'" <u>Id.</u> (quoting <u>Corsello v. Lincare, Inc.</u>, 428 F.3d 1008, 1012 (11th Cir. 2005)).

## III.   Discussion

Defendant argues that each Count of the Amended Complaint fails to state a claim upon which relief can be granted.  (D.E. 16 at 6-17.)

### a.   Count I: Breach of Contract

To state a claim for breach of a maritime contract, a plaintiff must allege (1) the terms of a maritime contract, (2) that the contract was breached, and (3) the reasonable value of the purported damages.  <u>See</u> <u>Sweet Pea Marine, Ltd. v. APJ Marine, Inc.</u>, 411 F3d 1242, 1249 (11th Cir. 2005).

The Parties do not dispute the existence of a maritime contract, but Defendant argues that the Amended Complaint fails to plausibly allege (1) a breach and (2) damages. (Mot. at 6-9.)

### 1.      Breach

First, Defendant argues that the Amended Complaint fails to plausibly allege a breach of the Parties' Contract.  (Id. at 6-8.)

At the center of the Parties' dispute is Clause 6(b) of the WFS Terms and Conditions, which provides:

> With respect to the quality of the Products supplied, samples shall be drawn at the time of delivery by the Seller's representatives. The method of sampling will be governed by local regulation, if such exists, otherwise as per the method used by the local physical supplier. Buyer or its representatives may witness the sampling but the absence of Buyer or its representatives at the time of sampling shall not prejudice the validity of the samples taken. These samples shall conclusively represent the quality of the Products supplied to the Receiving Vessel. In the event of a claim by Buyer basis an analysis result showing that any agreed specification parameter(s) has exceeded the confidence level(s) according to the relevant sections on precision and interpretation of test results in the ISO 4259 standard, the sample(s) in Seller's or its physical supplier's possession shall be tested for the allegedly off-specification parameters only and analyzed by an independent surveyor, located in the country (and where available, port) of supply, whose results shall be conclusive and binding on both Buyer and Seller, absent fraud or manifest error. The independent surveyor shall be appointed by the Seller, and the surveyor's fee shall be shared equally by Buyer and Seller (provided, however, if such surveyor analysis does not show any deviations from agreed-upon quality, the surveyor's fee shall be for Buyer's account).

(D.E. 4-3 at 3.)

Defendant argues that pursuant to Clause 6(b), the sample taken by Sentek at the time of delivery conclusively determines the quality of the Bunker supplied.  (Mot. at 7.)

7

It argues that Plaintiff "acknowledges that the agreed representative sample—the Supplier Sample in Sentek's possession (the only sample that matters per the contract's express terms)—revealed that the Bunkers were on specification." (Id. (citing Am. Compl. ¶ 16).) And because the process set forth in Clause 6(b) of the Marine Fuel Contract "is the only process by which to determine the fuel's quality[,]" (id.), the Amended Complaint's allegations confirm that Defendant "sold fuel that was on specification as defined by the parties' agreement such that [Defendant] did not breach the Marine Fuel Contract[,]" (id. (citing Sempra Energy Trading v. BP Prods. N. Am., 860 N.Y.S.2d 71, 72 (N.Y. App. Div. 2008); Curacao Oil N.V. v. Trafigura Pte., 128 N.Y.S.3d 781 (Table), 2020 WL 3494685, at *5–7 (N.Y. Sup. Ct. Feb. 3, 2020) aff'd, 132 N.Y.S.3d 774 (2020))). It argues that the "purportedly off-specification samples are thus irrelevant to the contract."[4]   (Id.) Defendant argues that to the extent Plaintiff contends that it may rely on its own samples to establish a breach because Defendant allegedly committed fraud, "the plausibility of its contract claim will turn on the viability of its fraud claim[,]" and because the fraud claim (Count III) should be dismissed, so too should the breach of contract claim (Count I). (Id.)

Plaintiff advances a different interpretation of Cluase 6(b). (Resp. at 5-6.) It argues that, "[i]n relation to the survey of the Seller's Sample, the phrase, 'whose results shall be

---

[4]   Defendant further argues that the samples taken from the Bunkers after they were removed from the Vessel are irrelevant because the Parties' Contract states that any sample drawn after delivery "shall not be valid as an indicator of the quality of" the Bunkers. (Id. at 8 (quoting WFS Terms and Conditions ¶ 6(c)).) However, in its Response, Plaintiff states that its claims are not based on the samples taken after delivery, but rather "are based upon samples that were drawn at the time of delivery." (Resp. at 7 (citing Am. Compl. ¶¶ 14-15) (emphasis in original).) In its Reply, Defendant acknowledges that "the parties agree that this dispute turns on Clause 6(b) of the contract's WFS Terms." (D.E. 21 at 2.) Accordingly, the Court need not analyze Defendant's argument as to Clause 6(c) of the WFS Terms and Conditions.

conclusive and binding on both Buyer and Seller, absent fraud or manifest error,' only applies to this specific sample." (Id. at 6.) It argues that regardless of whether the Supplier Sample is found to be on specification, "the other samples can be used as evidence to show that the entirety of the delivery was off specification." (Id.) It argues that when read as a whole, "it was clearly the intent of the Parties' that all of the samples be open for analysis and quality-determination, as just a few sentences prior it states that '[t]hese samples shall conclusively represent the quality of the Products supplied to the Receiving Vessel.'" (Id. (emphasis in original).) Plaintiff further argues that, "[a]t most, Clause 6(b) of the WFS terms creates a burden-shifting with respect to the independent surveyor's results of the sample(s) in Defendant's or its physical supplier's possession." (Id. at 7.) That is, even if Clause 6(b) renders Sentek's sample conclusive and binding as to the quality of the entire bunker sold to Plaintiff, "then the results of the other three samples present clear evidence of the very 'fraud or manifest error' that Clause 6(b) states removes the conclusive/binding nature of that one sample." (Id.) Finally, Plaintiff argues that its fraud claim has no bearing on the viability of its breach of contract claim. (Id. at 7-8.) Rather, for pleading purposes, it is enough that Plaintiff plausibly alleged the elements of a breach of contract claim. (Id. at 8.)

Defendant argues that Plaintiff's "reading of Clause 6(b)—that all fuel samples can be used to determine the tendered fuel quality in the event of a dispute—destroys the finality of this dispute resolution mechanism." (Id.) It argues that, in fact, "under [Plaintiff's] construction, Clause 6(b) would never serve to resolve a dispute." (Id.) As such, Defendant argues that the Court should reject Plaintiff's interpretation. (Id. (citing

Curacao Oil, 2020 WL 3494685, at *2, 5-7).)  Defendant argues that the word "samples" is written in the plural to reflect that Clause 6(b) contemplates that several "samples shall be drawn at the time of delivery," but only those samples retained by the Seller (WFS) or its Physical Supplier (Sentek) "shall be conclusive and binding" in the event of a dispute concerning the fuel quality.  (Id.)

It is undisputed that the Marine Fuel Contract establishes that fuel samples would be drawn at the time of delivery by Sentek, and that those "samples shall conclusively represent the quality of the Products supplied to the Receiving Vessel."  (WFS Terms and Conditions ¶ 6(b).)  The Amended Complaint alleges that "Sentek delivered the marine fuel to the Vessel in Singapore on September 24, 2021."  (Am. Compl. ¶ 12.)  It further alleges that samples were "supposed to be" provided to the receiving Vessel.  (Id.)  It further alleges that on September 28, 2021, the Vessel's Owners notified Plaintiff that an analysis of one of the samples—the "Viswa Sample"—"revealed that the Bunkers were off specification with respect to water, aluminum, and silicon levels found in the sample."  (Id. ¶ 14.)  Although it is not clear who took the "Viswa Sample," when construed in the light most favorable to Plaintiff, the Viswa Sample was taken by Sentek at the time of delivery and provided to the receiving Vessel.  (See id. ¶¶ 12-14.)

Pursuant to Clause 6(b), if a sample shows that the fuel exceeds the relevant specifications, "the sample(s) in Seller's or its physical supplier's possession shall be tested for the allegedly off-specification parameters only and analyzed by an independent surveyor . . . whose results shall be conclusive and binding on both Buyer and Seller, absent fraud or manifest error."  (WFS Terms and Conditions ¶ 6(b).)  In this regard, Paragraph

15 of the Amended Complaint alleges that on October 27, 2021, a sample from Defendant—what Plaintiff terms the "Supplier Sample"—was tested and revealed that "the Bunkers were on-specification for water, aluminum, and silicon levels." (Am. Compl. ¶ 15.) The Amended Complaint does not indicate whether the Supplier Sample was tested by an independent surveyor. If it was—as the Parties' seem to suggest—then the results are "conclusive and binding on both Buyer and Seller, absent fraud or manifest error." (WFS Terms and Conditions ¶ 6(b).)

In this regard, the Amended Complaint alleges that after the Supplier Sample was tested, the Owners tested two other samples and both were found to be off-specification for water, aluminum, and silicon levels. (Am. Compl. ¶¶ 16-17.) Thus, it "became apparent to Owners and [Plaintiff] that the Supplier Sample came from a different source than the Bunkers supplied to the Vessel . . . ." (Am. Compl. ¶ 18.)

Based on the foregoing, the Court finds that the Amended Complaint plausibly alleges the breach element of a maritime breach of contract claim. Specifically, it alleges that the Parties entered into a contract for the sale of marine fuel that met "the requirements for marine distillate fuels pursuant to the ISO 8217 2010 Fuel Standard." (Id. ¶¶ 10, 13, 27-28.) It further alleges that Defendant breached the contract by providing fuel that failed to meet the specified requirements. (Id. ¶¶ 14, 16-17, 30-31.) The Marine Fuel Contract provided a mechanism by which the quality of the fuel could be conclusively determined "absent fraud or manifest error." (WFS Terms and Conditions ¶ 6(b).) It appears that this mechanism was invoked in this case and that the samples revealed that the fuel was on-specification, (see Am. Compl. ¶ 15), but Plaintiff alleges that Defendant committed a

fraud, (id. ¶ 18).  And as explained in Section III(c), infra, the Amended Complaint contains facts supporting an inference that Defendant committed a fraud.[5]  Because Plaintiff has plausibly alleged a fraud, the samples do not conclusively determine the fuel's quality.  See Curacao Oil, 2020 WL 3494685, at *5 (finding that third-party's determination on marine fuel quality was final and binding under substantively identical contractual provision because the plaintiff did not allege fraud or manifest error).

## 2.    Damages

Next, Defendant argues that the Amended Complaint fails to plausibly allege that Plaintiff incurred damages.  (Mot. at 8-9.)  It argues that under the Marine Fuel Contract Defendant is not liable for "indirect, special, incidental, exemplary, punitive or consequential damages[,]" including, among other things, costs arising out of vessel delays, lost profits, and loss caused by business interruption[.]"  (Id. at 8 (citing WFS Terms and Conditions ¶ 6(g)).)  It argues that "[t]he only purported damages that Omegra alleges it suffered . . . relate to those types of expressly excluded damages[,]" (id. at 8-9); for example: (1) Plaintiff "being unable to 'fix' the Vessel (i.e., rent the Vessel to a third party), (2) costs associated with sailing to Singapore and the Straits of Malacca to de-bunker the Vessel, (3) costs associated with testing various Bunker samples, and (4) other expenses relating to the Bunkers[,]" (id. at 9 (citing Am. Compl. ¶¶ 22, 24)).  Thus, Defendant argues that Plaintiff failed to allege any recoverable damages.  (Id. at 9 (citing People's Tr. Ins.

---

[5]       The Court need not determine whether Plaintiff is required to plead a claim for fraud upon which relief can be granted in order to invoke the fraud exception in Clause 6(b) of the WFS Terms and Conditions because even assuming Plaintiff is so required, Count III plausibly alleges a fraud claim for the reasons explained in Section III(c), infra.

Co. v. Alonzo-Pombo, 307 So. 3d 840, 842 (Fla. Dist. Ct. App. 2020); Kelly v. Lee Cnty.

RV Sales, 819 F. App'x 713, 717 (11th Cir. 2020); Cooper v. Meridian Yachts, 575 F.3d

1151, 1167 (11th Cir. 2009); Korea Line Corp. v. World Fuel Servs., Corp., 14-20122-Civ-

Williams, D.E. 41 (S.D. Fla. June 30, 2015); Murphy v. Young Men's Christian Ass'n, 974

So. 2d 565, 568 (Fla. Dist. Ct. App. 2008)).)  Defendant argues that to the extent that

Plaintiff argues that Defendant's purported gross negligence renders the contract's remedy

limitation unenforceable, the plausibility of its contract claim will turn on the viability of

its gross negligence claim, and because the gross negligence claim (Count IV) should be

dismissed, so too should the breach of contract claim (Count I).  (Id. at 9.)

Plaintiff argues that, at a minimum, it incurred "direct damages by not receiving the

benefit of its bargain."  (Resp. at 9.)  "That is, it paid for a certain quantity and quality of

marine fuel that, due to insufficient quality, it was unable to use to fuel its chartered vessel.

Nowhere in the WFS Terms is Omegra prevented from recovering its direct damages (e.g.,

use of the product it paid for)[.]"  (Id.)  Plaintiff further argues that "Defendant cannot rely

on its own limitation of liability clause to exclude damages that it caused by its own acts

of misconduct or gross negligence."[6]  (Id.)

In its Reply, Defendant argues that although Plaintiff asserts that it can recover

direct damages, Plaintiff "does not allege that it incurred any such damages, it only alleges

---

[6]     Plaintiff also argues that the cases to which Defendant cites are distinguishable.
(Resp. at 9-10.)  In its Reply, Defendant argues that Plaintiff's attempt to distinguish the cases
cited in Defendant's Motion is "unnecessary" because Defendant "relied on those opinions simply
for the proposition that courts enforce the kind of limitation-of-liability provision at issue here."
(Reply at 5 n.4.)

that it incurred the expressly excluded damages." (D.E. 21 at 5.) It further argues that "the parties agree that the only way Omegra could recover these excluded damages is if it establishes that WFS was grossly negligent[,]" but because Count IV should be dismissed, so too should Count I. (Id.)

The Court finds that when construed in the light most favorable to Plaintiff, the Amended Complaint plausibly alleges that Plaintiff incurred direct damages by paying for fuel that it was unable to use. Specifically, it alleges that on September 10, 2021, Plaintiff and Defendant entered into a contract for the sale of marine fuel. (Am. Compl. ¶ 10.) "Pursuant to the Bunker Sale Confirmation . . . , the Bunkers needed to meet the requirements for marine distillate fuels pursuant to the ISO 8217 2010 Fuel Standard." (Id. ¶ 13.) The Amended Complaint alleges that the fuel that was delivered to the Vessel did not mee the requisite standard. (Id. ¶¶ 14, 16, 17, 19.) It further alleges that "[b]ecause the Bunkers were off-specification, Owners refused to consume them." (Id. ¶ 22.) Indeed, in the prayer for relief, the Amended Complaint seeks an award of damages "in an amount equal to any damages it suffered directly and consequentially[.]" (Id. at 9 (emphasis added).) Thus, when construed in the light most favorable to Plaintiff, the Amended Complaint plausibly alleges that Plaintiff suffered direct damages by paying for fuel that it was unable to consume because it did not meet the standards required by the contract. See No Spill, Inc. v. Scepter Canada, Inc., 429 F. Supp. 3d 768, 783 (D. Kan. 2019) (granting motion to dismiss breach of contract claim to the extent it sought consequential damages because they were waived by the contract's limitation of liability clause, but denying motion to dismiss claim for direct damages because the complaint's prayer for relief sought

direct damages and direct damages were available under the UCC); <u>BCC Merchant Solutions, Inc. v. Jet Pay, LLC</u>, 129 F. Supp. 3d 440, 479-80 (N.D. Tex. 2015) (granting defendant's motion for summary judgment on breach of contract claim to the extent plaintiff sought consequential damages because consequential damages were waived by the contract, but denying motion for summary to the extent plaintiff sought direct damages for breach of contract).

Because the Court finds that Count I states a claim for breach of contract to the extent it seeks direct damages, the Court need not determine at this stage whether Defendant's purported gross negligence renders the contract's remedy limitation unenforceable such that Plaintiff may be entitled to consequential damages.  Plaintiff may reraise that argument at the summary judgment stage, if appropriate.

### b.   **Count II**: **Negligence**

Next, Defendant argues that Count II fails to state a claim for negligence because (1) it is barred under the maritime economic loss rules associated with <u>Robins Dry Dock & Repair v. Flint</u>, 275 U.S. 303 (1927), and <u>East River Steamship v. Transamerica Delaval</u>, 476 U.S. 858 (1986), and (2) it fails to allege sufficient facts plausibly supporting that Plaintiff was damaged by Defendant's alleged negligence.  (Mot. at 9-13.)  Because the Court finds that Count II must be dismissed with prejudice as barred by the economic loss rule, the Court confines its analysis to that issue.

### 1.   **Robins Dry Dock** **Rule**

Defendant initially argues that Count II is barred by the economic loss rule associated with the Supreme Court's decision in <u>Robins Dry Dock</u>, 275 U.S. at 309.

Defendant argues that Plaintiff "seeks to recover only economic losses in its negligence claim" but does not allege "(1) that there was a physical injury to the Vessel, nor (2) that it held a property interest in the Vessel." (Mot. at 10.)  As such, it argues that the negligence claim is barred by the <u>Robins Dry Dock</u> rule.  (<u>Id.</u> (citing <u>Heinen v. Royal Caribbean Cruises LTD</u>, 806 F. App'x 847, 850 (11th Cir. 2020); <u>Louisville and N. R.R. Co. v. M/V Bayou Lacombe</u>, 597 F.2d 469, 471-74 (5th Cir. 1979); <u>Trans-Tec Int'l v. TKK Shipping (PTE)</u>, 18-cv-23199-Williams, D.E. 81 (S.D. Fla. Nov. 25, 2020)).)

In its Response, Plaintiff argues that Defendant misapplied <u>Robins Dry Dock</u>. (Resp. at 11.)

In its Reply, Defendant argues that Plaintiff failed to oppose Defendant's argument on this issue, and that by conceding that it did not allege any physical injury to Plaintiff's property Plaintiff "all but admits its negligence claim is barred under <u>Robins Dry Dock</u>." (<u>Reply</u> at 6 (citing <u>Trans Tec</u>, 18-cv-23199-Williams, D.E. 81 at 4-8).)

In <u>Robins Dry Dock</u>, the Supreme Court stated that "as a general rule, . . . a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong." 275 U.S. at 309.  Under this rule, "a party may not recover for economic losses not associated with physical damages." <u>Kingston Shipping Co., Inc. v. Roberts</u>, 667 F.2d 34, 35 (11th Cir. 1982).  <u>See also</u> <u>Heinen v. Royal Caribbean Cruises LTD</u>, 806 F. App'x 847, 850 (11th Cir. 2020) ("Under federal maritime law, a plaintiff suing for an unintentional tort cannot recover 'for economic losses not associated with physical damages.'") (quoting <u>Kingston Shipping</u>, 667 F.2d at 35).  Additionally, the former Fifth

Circuit—whose precedent this Court is bound to apply, <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981)—focuses on "the character of the interest harmed[,]" and is "reluctant to recognize claims based solely on harm to the interest in contractual relations or business expectancy." <u>Vicksburg Towing Co. v. Miss. Marine Transp. Co.</u>, 609 F.2d 176, 177 (5th Cir. 1980) (citations omitted).

Here, Plaintiff appears to concede that it has not alleged that Defendant's negligence caused physical damage. (<u>See</u> Resp. at 11-12.) Specifically, in its Response, Plaintiff

> does not state that the off-specification marine fuel damaged itself; rather, it caused damages in myriad other ways. Count II of the Amended Complaint makes no mention of a tort committed against the ship itself or its owner. Rather, it states that, in supplying marine fuel to Omegra to fuel the vessel that Omegra had on time-charter, Defendant had a duty to Omegra to supply fuel that was suitable and safe for use. <u>Am. Compl.</u> (Dkt. 4) ¶36. And in breaching this duty, Omegra suffered damages, including disruption and delay of operations and other losses resulting from the supply of off-spec marine fuel. <u>Id.</u> ¶38.

(<u>Id.</u>) These economic losses are not associated with physical damages, are "based solely on harm to the interest in contractual relations or business expectancy[,]" <u>Vicksburg Towing</u>, 609 F.2d at 177, and, as such, are precisely the type of losses barred by the rule in <u>Robins Dry Dock</u>, 275 U.S. at 309. <u>See</u> <u>Kingston Shipping</u>, 667 F.2d at 35 (applying <u>Robins Dry Dock</u> rule to deny claim for damages "incurred as a result of [the plaintiffs'] delayed passage into or out of the port of Tampa" where the defendants' negligence caused the plaintiffs no physical damages); <u>Louisville and N. R.R.</u>, 597 F.2d at 472-74 (applying <u>Robins Dry Dock</u> rule to deny claim for damages stemming from the temporary loss of the use of a bridge where the defendant's negligence caused the plaintiff no physical damages). Indeed, in substantially similar circumstances, Judge Williams found that the rule in <u>Robins</u>

17

Dry Dock entitled a bunker supplier to judgment on the pleadings as to a time-charterer's negligence claim.  Trans Tec, 18-cv-23199-Williams, D.E. 81 at 4-8.  The Court agrees with Judge Williams's analysis and finds that the rule in Robins Dry Dock bars the negligence claim in Count II as a matter of law.  Id.  Consequently, Count II must be dismissed with prejudice.  See Matter of N.W. Rock Prods., Inc., CASE NO. C16-5340RBL, 2018 WL 294500, at *3 (W.D. Wash. Jan. 4, 2018) (dismissing claims with prejudice because the rule in Robins Dry Dock barred the claims as a matter of law).

However, even assuming arguendo that Count II is not barred by the rule in Robins Dry Dock, for the reasons discussed in the next subsection, Count II is nevertheless subject to dismissal under the economic loss rule associated with the Supreme Court's decision in East River, 476 U.S. at 871.

## 2.    East River Rule

Next, Defendant argues that Count II is barred by the economic loss rule associated with the Supreme Court's decision in East River, 476 U.S. at 871.  (Mot. at 11-12.)  It argues that the negligence claim in Count II "is based on the same general allegations asserted in support of its breach of contract claim such that there is no material difference between the two causes of action."  (Id.)  It argues that the Amended Complaint alleges that Defendant "breached a duty arising out of the parties' contract, and [Plaintiff] alleges the same exact economic-loss damages as in its contract claim."  (Id. at 12.)  Therefore, it argues that Count II is barred by East River.  (Id. (citing Am. Marine Tech, Inc. v. World Grp. Yachting, Inc., 418 F. Supp. 3d 1075, 1082 (S.D. Fla. 2019); Great Lakes Reinsurance (UK) PLC v. Sunset Harbour Marina, Inc., CASE No. 10-24469-CIV-JORDAN, 2011 WL

13223741, at *3 (S.D. Fla. July 1, 2011); Trans Tec, 18-cv-23199-Williams, D.E. 81 at 5-9 & n.2)).)

Plaintiff argues that East River does not apply because Count II assumes that there was no valid contract between the Parties. (Resp. at 10-11.)

In its Reply, Defendant maintains that Count II is barred by the East River doctrine because Plaintiff's "negligence claim is based on the same breach of duty and damages as in its breach of contract claim such that there is no material difference between the two causes of action." (Id. at 7.)

In East River, the Supreme Court held that "an admiralty tort plaintiff cannot recover for the physical damage the defective product causes to the 'product itself'; but the plaintiff can recover for physical damage the product causes to 'other property.'" Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875, 877 (1997) (discussing E. River). The Court reasoned that when the damage is to the product itself, "the injury suffered—the failure of the product to function properly—is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain." E. River, 476 U.S. at 868. "[T]he maritime economic loss doctrine has been expanded to reach situations where a party is attempting to bring a breach of contract action couched as a tort claim." R/V Beacon, LLC v. Underwater Archeology & Exploration Corp., No. 14–CIV–22131, 2014 WL 4930645, at *5 (S.D. Fla. Oct. 1, 2014) (citing BVI Marine Constr. Ltd. v. ECS-Fla., LLC, No. 12–80225–CIV, 2013 WL 6768646, at *3-4 (S.D. Fla. Dec. 20, 2013)). The Supreme Court's decision in East River "indirectly cautioned that claims sounding in tort but stemming a contractual dispute are often more appropriately remedied pursuant to the

contractual relationship." Id. (citing E. River, 476 U.S. at 874; BVI Marine, 2013 WL 6768646, at *4). See also Trans Tec, 18-cv-23199-Williams, D.E. 49 at 5-6 (S.D. Fla. July 29, 2019).

Here, there is no material difference between Plaintiff's negligence claim and breach of contract claim, as they are premised on virtually identical facts. (Compare Am. Compl. ¶¶ 26-34, with id. ¶¶ 35-40.) Count I alleges that Defendant had a contractual duty to provide marine fuel of a certain quality, Defendant provided fuel that did not meet the required specifications, and as a result, Plaintiff suffered damages. (Id. ¶¶ 28, 30-31, 34). Count II alleges that Defendant had a non-contractual duty to provide marine fuel of a certain quality, Defendant provided fuel that did not meet the required specifications, and as a result, Plaintiff suffered damages. (Id. ¶¶ 36-40.) Under substantially similar facts, Judge Williams found that the rule in East River barred the time-charterer's negligence claim against a bunker supplier as a matter of law, and dismissed the claim with prejudice. Trans-Tec, 18-cv-23199, D.E. 49 at 5-9. The Court agrees with Judge Williams's analysis. Consequently, the Court finds that Count II must be dismissed with prejudice. Id. at 9.

### c.   **Count III: Fraud**

Next, Defendant argues that Count III fails to state a claim for fraud. (Mot. at 13-19.) Specifically, it argues that Plaintiff "fails to allege how the asserted fraud in any way caused [Plaintiff's] alleged damages." (Id. at 14 (emphasis in original).) It argues that the allegedly fraudulent conduct—providing Plaintiff with a fabricated sample of fuel to deceive Plaintiff regarding the fuel's quality—occurred after the fuel was delivered and after Plaintiff had put Defendant on notice that it believed the fuel was off specification.

(Id. at 14-15.)  "And Omegra's damages all relate to Owners' decision not to consume the allegedly off-specification fuel, a decision that was made before the Supplier Sample was ever tested."  (Id. at 15.)  As such, Defendant argues that Plaintiff would have incurred the asserted damages "whether the purportedly off-specification fuel was the product of fraud or not[.]"  (Id.)  Defendant further argues that the Amended Complaint fails to comply with the heightened pleading requirements of Rule 9(b) in that it "fails to specifically allege who created the purportedly false sample of fuel, when that sample was created, where it was created it, how it was created, or any other facts regarding the circumstances of the allegedly fraudulent scheme."  (Id.)  Defendant further argues that Count III fails to plausibly allege fraud because it impermissibly bases its assertions on "information and belief" without any supporting factual information.  (Id. at 15-16 (citing Sinaltrainal, 578 F.3d at 1268; Magnum Constr. Mgmt, LLC v. WSP USA Solutions, Inc., 522 F. Supp. 3d 1202, 1209 (S.D. Fla. 2021); Scott v. Experian Info. Solutions, Inc., CASE NO. 18-CV-60178-ALTONAGA/Seltzer, 2018 WL 3360754, at *6-7 (S.D. Fla. June 29, 2018)).

Plaintiff concedes that "'[a]s a general rule, [allegations pleaded on information and belief] will not satisfy Rule 9(b)[,]'" (Resp. at 13 (quoting Tribune Co. v. Purcigliotti, 869 F. Supp. 1076, 1090 (S.D.N.Y. 1994))), but argues that "where 'much of the factual information needed to fill out plaintiff's complaint lies peculiarly within the opposing parties' knowledge,' as is often the case where fraud is involved, 'the general rule disfavoring allegations founded upon belief ought not to be rigidly enforced[,]'" (id. (quoting Tribune, 869 F. Supp. at 1090 (quoting DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1248 (2d Cir. 1987)))).  Plaintiff argues that it has pled its fraud claim

with as much particularity as is possible at this time.  (Id. at 14.)  It argues that "[p]unishing [Plaintiff] for not having the information to plead with any more particularity than what has already been pled is a gross mischaracterization of the purpose and intent of the Federal Rules of Civil Procedure and otherwise defeats the purpose of the discovery process . . . ."  (Id.)  Plaintiff further argues that the Amended Complaint alleges that Defendant's fraud caused Plaintiff's damages.  (Id. at 15.)  Specifically, it argues that

> [Plaintiff] relied on Defendant's assertions that the fuel it provided was on specification, and thus agreed to pay for it in full and use it during the course of the vessel's operations. See Am. Compl. (Dkt. 4) ¶12, 45-47.  By attempting to use this off-specification marine fuel, the vessel suffered from disruption and delay in operations and other losses.  Id. ¶47.  If, as alleged in the Amended Complaint, it is proven that Defendant knew the fuel was off-specification, induced [Plaintiff] to purchase it nonetheless by way of producing a false sample, and [Plaintiff] suffered damages as a result, then the elements of fraud under Florida law are clearly met.

(Id.)

In its Reply, Defendant maintains that Count III fails "to satisfy ordinary pleadings standards" because its allegations are based upon "information and belief" without any facts supporting the belief.  (D.E. 21 at 8 (citing Sinaltrainal, 578 F.3d at 1268; Magnum Constr., 522 F. Supp. 3d at 1209; Scott, 2018 WL 3360754, at *6-7)).)  It further argues that Plaintiff's position—i.e., that it would be unfair to require it to allege facts that it does not know and that are in Defendant's possession, including facts regarding Defendant's fraudulent knowledge and intent—is "precisely what the Supreme Court addressed and rejected in Iqbal/Twombly."  (Id. (citing Iqbal, 556 U.S. at 686-87).)  It argues that "'[d]iscovery is not intended as a fishing expedition permitting the speculative pleading of a case first and then pursuing discovery to support it.'"  (Id. (quoting Tormenia v. LVNV

Funding, Case No. 8:18-cv-2347-T-23TGW, 2019 WL 3429591, at *5 (M.D. Fla. July 30, 2019)).)  It argues that under Rule 9(b) a plaintiff still must allege sufficient underlying information to support each belief.  (Id. at 9 (citing Great Fla. Bank v. Countrywide Home Loans, Inc., No. 10–22124–CIV, 2011 WL 382588, at *5-6 (S.D. Fla. Feb. 3, 2011)).)  It argues that "in arguing that [Plaintiff] need not allege facts that it does not know, [Plaintiff] concedes that its claimed fraud is sheer speculation."  (Id.)  Defendant maintains that the Amended Complaint fails to satisfy Rule 9(b) because although Plaintiff does allege "the who, what, when, where, and how of Sentek providing the Supplier Sample for testing[,]" (id. (citing Resp. at 14-15)), Plaintiff does not "specifically allege the circumstances regarding [Defendant's] purportedly fraudulent statements[,]" (id.).  It argues that Plaintiff is attempting to reframe its fraud claim as one based on the "conduct of supplying" a sample of fuel from a different source, but a Florida fraud claim must be based on a false "statement" made to the Plaintiff.  (Id.)  Defendant further argues that even if Plaintiff had adequately alleged a fraud claim based on the "conduct of supplying" a sample of fuel from a different source, the false sample did not cause the damages Plaintiff seeks.  (Id.)  It argues that

> Regardless of whether the Supplier Sample contained fuel from a different source, regardless of whether [Defendant] knew that, and regardless of whether [Defendant] intended to mislead [Plaintiff] in this respect, [Plaintiff] would have incurred all of the sought damages, which arose out of Owners' decision not to consume the fuel.  Indeed, as alleged, Sentek provided the Supplier Sample for testing (i.e., the purportedly "fraudulent" "conduct") well after delivering the fuel, well after Owners already decided not to consume the fuel, and well after [Plaintiff] put [Defendant] on notice of off-specification fuel.  See Am. Compl. ¶¶ 14, 15, 19, 22, 45.

(Id. at 9-10.)

To state a claim for common-law fraud under Florida law, a plaintiff must allege that "(1) the opposing party made a misrepresentation of a material fact, (2) the opposing party knew or should have known the falsity of the statement, (3) the opposing party intended to induce the aggrieved party to rely on the false statement and act on it, and (4) the aggrieved party relied on that statement to his or her detriment."  Jackson v. Shakespeare Found., Inc., 108 So. 3d 587, 595 n.2 (Fla. 2013) (citing Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010)).  The first element may be satisfied by conduct.  See Prentice v. R.J. Reynolds Tobacco Co., __ So. 3d __, 2022 WL 805951, at *4 (Fla. 2022) (observing that "the common law has long recognized that the representation underlying a fraud claim can be communicated through myriad forms of conduct" and that "[f]raud is effected through representations").  "What matters is that the defendant intend to induce the plaintiff's reliance by creating a false impression in the plaintiff's mind."  Id.  Pursuant to Rule 9(b), "the circumstances constituting fraud" must be pled with particularity.  See In re Galectin Therapeutics, Inc. Secs. Litig., 843 F.3d at 1269.

As to the first element, Count III alleges that Defendant made a false representation of material fact by "providing a sample of marine fuel for testing that was not from the off-spec marine fuel that it sold [Plaintiff.]"  (Am. Compl. ¶ 42.)  As to the second element, the Amended Complaint alleges: "Based on information and belief, [Defendant] . . . knew that the sample provided to [Plaintiff] for testing was not from the off-spec marine fuel that [Defendant] sold [Plaintiff] and that Sentek physically supplied and delivered to [Plaintiff.]"  (Id. ¶ 44.)  As to the third element, the Amended Complaint alleges: "Based upon information and belief, [Defendant] . . . intended that, by providing a sample for

24

testing that was not from the off-spec marine fuel that [Defendant] sold [Plaintiff] . . . , [Plaintiff] would be induced not to make any claims against [Defendant] . . . for the sale or supply of off-spec marine fuel."  (Id. ¶ 45.)  As to the fourth element, the Amended Complaint alleges that "[Plaintiff] relied on [Defendant] to provide marine fuel that met the specifications and relied on the results of the sample provided by [Defendant] and Sentek in its decision to accept the Bunkers and, initially, object to Owners' request to de-bunker[,]" (id. ¶ 46), and "[a]s a direct result of [Defendants'] . . . false representations, the Vessel has suffered from disruption or delay of operations, and other losses resulting from the supply of off-spec marine fuel[,]" (id. ¶ 47).

First, the Court rejects Defendant's argument that the Amended Complaint fails to allege how the asserted fraud caused Plaintiff's alleged damages. The Amended Complaint alleges that Plaintiff relied on Defendant's false sample to initially object to the Owners' request to debunker, and such reliance disrupted or delayed operations.  (Id. ¶¶ 46-47.)  When construed in the light most favorable to Plaintiff, these allegations raise the plausible inference that but-for the allegedly false sample provided by Defendant, Plaintiff would have de-bunkered sooner, that the delay and/or disruption in operations would have been shorter, and, therefore, that Plaintiff's losses would have been minimized.  Thus, at least to that extent, Count III alleges that Plaintiff relied on Defendant's misrepresentation to its detriment.

Second, the Court rejects Defendant's argument that Plaintiff's allegations regarding knowledge and intent are inadequate because they are based upon "information and belief."  Although it is true that allegations based upon "information and belief" must

include factual content that allows the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged[,]" <u>Sinaltrainal</u>, 578 F.3d at 1268 (quoting <u>Iqbal</u>, 556 U.S. at 678), here, the Amended Complaint asserts a factual basis supporting the "belief[s]" pled.  Specifically, it alleges that four fuel samples were tested and three of them revealed that the Bunkers were off specification.  (Am. Compl. ¶¶ 14-17.) The WFS Terms and Conditions provide that in the event the bunkers are off specification, Defendant must replace the bunkers.  (<u>Id.</u> ¶ 6(g).)  The Amended Complaint alleges that the one sample that conclusively represents the quality of the bunkers—the "Supplier Sample"— just so happened to be the one sample that was on-specification for water, aluminum, and silicon.  (Am. Compl. ¶¶ 14-17; WFS Terms and Conditions ¶ 6(b).)  One could reasonably infer that Defendant knew that the bunkers delivered to the Vessel were off-specification, so Defendant provided a false sample of on-specification fuel to deceive Plaintiff into believing it had purchased on-specification fuel.  One could further reasonably infer that Defendant intended Plaintiff to rely on the false sample, and the Amended Complaint plausibly alleges that Plaintiff did rely on this misrepresentation to its detriment by initially objecting to the Owners' request to debunker, which further disrupted and delayed operations.  (Am. Compl. ¶¶ 46-47.)  Therefore, the Court finds that Count III plausibly alleges a claim for fraud.

### d.    Count IV

Finally, Defendant argues that Plaintiff "fails to allege facts supporting its gross negligence claim's heightened reckless, conscious breach requirement."  (Mot. at 16; <u>see also id.</u> at 16-17 (citing <u>Lamm v. State St. Bank & Tr. Co.</u>, 889 F. Supp. 2d 1321, 1329

(S.D. Fla. 2012); VL8 Pool, Inc. v. Glencore Ltd., 20-CV-2053-ALC, 2021 WL 6113981, at *2-3 (S.D.N.Y. Dec. 27, 2021)).)  It argues that Plaintiff "does not assert any allegations that [Defendant] knowingly delivered off-specification fuel or otherwise explain what [Defendant] could have done to obtain that knowledge."  (Id.)  It argues that the Amended Complaint actually confirms that Defendant took reasonable care in its duties because Sentek took multiple samples of fuel at delivery and the "contractually binding Supplier Sample" revealed that the fuel was within the contract's specifications.  (Id. (citing Am. Compl. ¶¶ 12, 15 & Ex. D).)

Plaintiff argues that the Amended Complaint describes "a scheme whereby Defendant, as seller of the contaminated fuel, directly participated in the scheme of providing purported samples of marine fuel that were not, in fact, from the off-specification product that was being sold."  (Resp. at 16.)  It argues that "this demonstrates a conscious disregard for the consequences of falsely claiming a supply of marine fuel to be fit for consumption when it clearly is not[.]"  (Id.)

In its Reply, Defendant maintains that the Amended Complaint fails to plausibly allege that "at the time of delivery, WFS knew that the fuel was off specification.  Nor does [Plaintiff] allege what WFS could have done but failed to do to obtain that knowledge." (D.E. 21 at 10 (emphasis in original).)

"Gross negligence . . . is defined as an act or omission that a reasonable, prudent person would know is likely to result in injury to another." Eller v. Shova, 630 So. 2d 537, 541 (Fla. 1993) (citing Glaab v. Caudill, 236 So. 2d 180 (Fla. Dist. Ct. App. 1970)).  The elements of gross negligence are: "(1) circumstances constituting an imminent or clear and

present danger amounting to a more than normal or usual peril, (2) knowledge or awareness of the imminent danger on the part of the tortfeasor, and (3) an act or omission that evinces a conscious disregard of the consequences." Elec. Boat Corp v. Fallen, __ So. 3d __, 2022 WL 2182264, at *2 (Fla. Dist. Ct. App. 2022) (quoting Moradiellos v. Gerelco Traffic Controls, Inc., 176 So. 3d 329, 335 (Fla. Dist. Ct. App. 2015)).[7]

Here, the Amended Complaint fails to plausibly allege (1) circumstances constituting an imminent or clear and present danger amounting to a more than normal or usual peril, or (2) knowledge or awareness of the imminent danger on the part of the tortfeasor.   The Amended Complaint merely alleges that the Parties contracted for Defendant to provide marine fuel to a Vessel that Plaintiff was time chartering, (D.E. 4 ¶¶ 6-10), and pursuant to the contract, "the Bunkers needed to meet the requirements for marine distillate fuels pursuant to the ISO 8217 2010 Fuel Standard." (Id. ¶ 13.)  However, even in the light most favorable to Plaintiff, the Amended Complaint does not allege that failure to provide on-specification marine fuel would present "an imminent or clear and present danger amounting to a more than normal or usual peril"—for example, an unreasonable risk of sinking or explosion—or that Defendant knew of such an imminent or clear and present danger.  At best, the Amended Complaint alleges simple negligence— that is, "conduct which a reasonable and prudent man would know might possibly result in

---

[7]      For purposes of recovering punitive damages, "'[g]ross negligence' means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."  Fla. Stat. § 768.72(2)(b).

injury to persons or property[.]"[8] <u>Moradiellos</u>, 176 So. 3d at 335 (quoting <u>Weller v. Reitz</u>, 419 So. 2d 739, 741 (Fla. Dist. Ct. App. 1982)).  Therefore, the Court finds that the Amended Complaint fails to state a claim for gross negligence, and Count IV must be dismissed without prejudice.

## IV.   Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.   Defendant's Motion to Dismiss the Amended Complaint (D.E. 16) is **GRANTED IN PART AND DENIED IN PART** consistent with this Order;

2.   Count II is **DISMISSED with prejudice**;

3.   Count IV is **DISMISSED without prejudice**; and

4.   Defendant shall have fourteen days from the date of this Order within which to file an Answer to Counts I and III the Amended Complaint.

**DONE AND ORDERED** in Chambers at Miami, Florida this 17th day of August, 2022.

_Joan A. Lenard_
**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**

---

[8]   However, for the reasons explained in Section III(b), <u>supra</u>, Plaintiff's negligence claim is barred as a matter of law under <u>East River</u> and <u>Robins Dry Dock</u>.