UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-20531-CIV-LENARD/LOUIS

**OMEGRA SHIPPING PTE
LTD. OF SINGAPORE,**

    Plaintiff,

v.

**WORLD FUEL SERVICES
(SINGAPORE) PTE LTD.,**

    Defendant.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR
RECONSIDERATION AND, ALTERNATIVELY, CERTIFICATION FOR
INTERLOCUTORY APPEAL (D.E. 47)**

**THIS CAUSE** is before the Court on Defendant World Fuel Service (Singapore) Pte Ltd.'s Motion for Reconsideration and, Alternatively, Certification for Interlocutory Appeal, ("Motion," D.E. 47), filed October 5, 2022.  Plaintiff Omegra Shipping Pte Ltd. of Singapore filed a Response on October 20, 2022, ("Response," D.E. 51), to which Defendant filed a Reply on October 27, 2022, ("Reply," D.E. 52).  Upon review of the Motion, Response, Reply, and the record, the Court finds as follows.

**I.**    **Background**

Because Defendant is seeking reconsideration of the Court's Order Granting in Part and Denying in Part Defendant's Motion to Dismiss the Amended Complaint, ("Order," D.E. 43), for consistency, the Court will reproduce the "Background" Section of the Order below:

At all relevant times, Plaintiff was the time charterer of the *M/V FORTUNE IRIS*, a bulk carrier vessel flagged under the laws of Hong Kong, China (the "Vessel"), which is owned by White Lilac Shipping S.A. (the "Owners"). (Am. Compl. ¶¶ 6-7.) Defendant sells marine fuel. (Id. ¶ 8.)

On September 10, 2021, Plaintiff and Defendant entered into a contract for the sale of marine fuel for the Vessel which was memorialized by a Bunker Sale Confirmation email (the "Marine Fuel Contract"), (id. ¶ 10), which Plaintiff attached to the Complaint. (D.E. 4-2). The Marine Fuel Contract incorporated the "WFS Marine Group of Companies General Terms and Conditions," (Am. Compl. ¶ 11), which Plaintiff also attached to the Complaint, ("WFS Terms and Conditions," D.E. 4-3).[1]

Defendant arranged for Sentek Marine and Trading Pte Ltd. ("Sentek") to supply and deliver fuel to the Vessel in Singapore on September 24, 2021 (the "Bunkers").[2] (Id. ¶¶ 9, 12.) Pursuant to Clause 6(b) of the WFS Terms and Conditions, samples of the marine fuel were supposed to be taken at the time the Bunkers were delivered to the Vessel and given to the receiving Vessel, the bunker tanker, the bunker surveyor, and the testing laboratory. (Id.) Pursuant to the Bunker Sale Confirmation, the Bunkers needed to meet the requirements for marine distillate fuels pursuant to the ISO 8217 2010 Fuel Standard. (Id. ¶ 13.)

On or about September 28, 2021, the Owners notified Plaintiff that the analysis of the sample with seal n. 4437256/A780024 (the "Viswa Sample") revealed that the Bunkers were off specification with respect to water, aluminum, and silicon levels found in the sample. (Id. ¶ 14.) The Viswa Sample failed to meet required specifications under the Time Charter between the Owners and Plaintiff, and therefore the entire supply of fuel from Defendant was unfit for use. (Id.)

---

[1] "[A] document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed." Horsely v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002) (citing Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999)). "'Undisputed' in this context means that the authenticity of the document is not challenged." Id. (citations omitted). Here, the WFS Terms and Conditions are central to Plaintiff's Amended Complaint, and its authenticity is not challenged.

[2] "Bunker fuel (or 'bunkers') is synonymous with maritime fuel." Barcliff, LLC v. M/V DEEP BLUE, IMO No. 9215359, 876 F.3d 1063, 1065 n.1 (11th Cir. 2017) (citing *Bunker fuel*, Webster's Third New International Dictionary, Unabridged).

On or about October 27, 2021, a second sample with seal n. 4437253 – but with no counter-seal from the Vessel – that was purported by Defendant to be from the same sale and delivery was tested (the "Supplier Sample"). (Id. ¶ 15.) The analysis of the Supplier Sample revealed that the Bunkers were on specification for water, aluminum, and silicon levels. (Id.)

On or about November 2, 2021, the Owners made available for testing a sample with seal n. A780022 – but with no counter-seal from Sentek (the "1st CCIC Sample"). (Id. ¶ 16.) The analysis of the 1st CCIC Sample revealed that the Bunkers were off specification for water, aluminum, and silicon levels. (Id.)

On or about November 16, 2021, the Owners made available for testing yet another sample with Sentek's seal n. 4437251 (the "2nd CCIC sample") which was found to be off specification for water, aluminum, and silicon levels. (Id. ¶ 17.)

The Owners and Plaintiff began to believe that the Supplier Sample came from a different source than the Bunkers supplied to the Vessel. (Id. ¶ 18.) On or about September 28, 2021, Plaintiff notified Defendant that the Bunkers did not meet the required specifications, that they affected the normal operations of the Vessel, and that Plaintiff reserved all its rights and remedies as a result. (Id. ¶ 19.)

Because the Bunkers were off specification, the Owners refused to consume them. (Id. ¶ 22.) As a result, Plaintiff was unable to fix the Vessel from October 22, 2021, at 6:21 am to November 25, 2021, at 12:01 am (33.74 days) until the Bunkers were de-bunkered. (Id.) In addition, the Vessel was forced to consume alternative sources of marine fuel to sail to Singapore and, subsequently, the Straits of Malacca to undertake de-bunkering operations. (Id.) Plaintiff also incurred significant costs to undertake testing of the various samples. (Id.) Once de-bunkered, the Bunkers were tested on November 24, 2021, and were again found to be off specification for water, aluminum, and silicon levels. (Id. ¶ 23.)

Plaintiff states that it is liable under the Time Charter to pay to the Owners expenses relating to the Bunkers during the period in question, and claim to be entitled to seek indemnity, contribution, and damages from Defendant. (Id. ¶ 24.)

On March 1, 2022, Plaintiff filed the operative Amended Complaint alleging claims for Breach of Contract (Count I), Negligence (Count II), Fraud (Count III), and Gross Negligence (Count IV). (D.E. 4.)

> On May 13, 2022, Defendant filed the instant Motion to Dismiss, arguing that each Count of the Amended Complaint fails to state a claim upon which relief can be granted. (D.E. 16.)

(D.E. 43 at 1-4.)

On August 17, 2022, the Court entered its Order Granting in Part and Denying in Part the Motion to Dismiss, dismissing Count II with prejudice, dismissing Count IV without prejudice, and denying the Motion as to Counts I and III. (D.E. 43.)

As to Count I, Defendant argued that the Amended Complaint fails to plausibly allege the (1) breach and (2) damages elements of a breach of contract claim. Only the breach element is relevant here, and centers on Clause 6(b) of the WFS Terms and Conditions, which provides:

> With respect to the quality of the Products supplied, samples shall be drawn at the time of delivery by the Seller's representatives. The method of sampling will be governed by local regulation, if such exists, otherwise as per the method used by the local physical supplier. Buyer or its representatives may witness the sampling but the absence of Buyer or its representatives at the time of sampling shall not prejudice the validity of the samples taken. These samples shall conclusively represent the quality of the Products supplied to the Receiving Vessel. In the event of a claim by Buyer basis an analysis result showing that any agreed specification parameter(s) has exceeded the confidence level(s) according to the relevant sections on precision and interpretation of test results in the ISO 4259 standard, the sample(s) in Seller's or its physical supplier's possession shall be tested for the allegedly off-specification parameters only and analyzed by an independent surveyor, located in the country (and where available, port) of supply, whose results shall be conclusive and binding on both Buyer and Seller, absent fraud or manifest error. The independent surveyor shall be appointed by the Seller, and the surveyor's fee shall be shared equally by Buyer and Seller (provided, however, if such surveyor analysis does not show any deviations from agreed-upon quality, the surveyor's fee shall be for Buyer's account).

(D.E. 4-3 at 3.)

4

Defendant argued in its Motion to Dismiss that the sample that conclusively determines the quality of the bunkers (i.e., the "Supplier Sample") tested on-specification, and therefore there was no breach. (D.E. 16 at 7.) Plaintiff argued, inter alia, that the Supplier Sample is only conclusive and binding "absent fraud or manifest error," and the three samples that tested off-specification were evidence of fraud. (D.E. 6-8.)

The Court agreed with Plaintiff, finding that Count I plausibly alleged the breach element of a breach of contract claim:

> Specifically, it alleges that the Parties entered into a contract for the sale of marine fuel that met "the requirements for marine distillate fuels pursuant to the ISO 8217 2010 Fuel Standard." (Id. ¶¶ 10, 13, 27-28.) It further alleges that Defendant breached the contract by providing fuel that failed to meet the specified requirements. (Id. ¶¶ 14, 16-17, 30-31.) The Marine Fuel Contract provided a mechanism by which the quality of the fuel could be conclusively determined "absent fraud or manifest error." (WFS Terms and Conditions ¶ 6(b).) It appears that this mechanism was invoked in this case and that the samples revealed that the fuel was on-specification, (see Am. Compl. ¶ 15), but Plaintiff alleges that Defendant committed a fraud, (id. ¶ 18). And as explained in Section III(c), infra, the Amended Complaint contains facts supporting an inference that Defendant committed a fraud.[3] Because Plaintiff has plausibly alleged a fraud, the samples do not conclusively determine the fuel's quality. See Curacao Oil, 2020 WL 3494685, at *5 (finding that third-party's determination on marine fuel quality was final and binding under substantively identical contractual provision because the plaintiff did not allege fraud or manifest error).

(Order at 10-12.)

As to Count III, Defendant argued that the Amended Complaint fails to plausibly allege fraud because, inter alia, it impermissibly bases its assertions on "information and

---

[3] The Court need not determine whether Plaintiff is required to plead a claim for fraud upon which relief can be granted in order to invoke the fraud exception in Clause 6(b) of the WFS Terms and Conditions because even assuming Plaintiff is so required, Count III plausibly alleges a fraud claim for the reasons explained in Section III(c), infra.

belief" without any supporting factual information. (Mot. at 15-16.) However, the Court found that Plaintiff pled sufficient factual matter from which the Court could infer fraud:

> Although it is true that allegations based upon "information and belief" must include factual content that allows the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged[,]" Sinaltrainal, 578 F.3d at 1268 (quoting Iqbal, 556 U.S. at 678), here, the Amended Complaint asserts a factual basis supporting the "belief[s]" pled. Specifically, it alleges that four fuel samples were tested and three of them revealed that the Bunkers were off specification. (Am. Compl. ¶¶ 14-17.) The WFS Terms and Conditions provide that in the event the bunkers are off specification, Defendant must replace the bunkers. (Id. ¶ 6(g).) The Amended Complaint alleges that the one sample that conclusively represents the quality of the bunkers—the "Supplier Sample"—just so happened to be the one sample that was on-specification for water, aluminum, and silicon. (Am. Compl. ¶¶ 14-17; WFS Terms and Conditions ¶ 6(b).) One could reasonably infer that Defendant knew that the bunkers delivered to the Vessel were off-specification, so Defendant provided a false sample of on-specification fuel to deceive Plaintiff into believing it had purchased on-specification fuel. One could further reasonably infer that Defendant intended Plaintiff to rely on the false sample, and the Amended Complaint plausibly alleges that Plaintiff did rely on this misrepresentation to its detriment by initially objecting to the Owners' request to debunker, which further disrupted and delayed operations. (Am. Compl. ¶¶ 46-47.) Therefore, the Court finds that Count III plausibly alleges a claim for fraud.

(Order at 25-26.)

On October 5, 2022, Defendant filed the instant Motion for Reconsideration and, Alternatively, Certification for Interlocutory Appeal. (D.E. 47.) Plaintiff filed a Response, (D.E. 51), to which Defendant filed a Reply, (D.E. 52).

**II.  Discussion**

Defendant moves the Court to reconsider its Order Granting in Part and Denying in Part Defendant's Motion to Dismiss the Amended Complaint. (Mot. at 7-15.)

Alternatively, Defendant moves the Court to certify an interlocutory appeal of the Court's Order. (Id. at 16-19.) The Court will discuss each issue in turn.

### a.      Motion for Reconsideration

Defendant argues that the Court's conclusion that fraud may be inferred from a conflict in bunker sample test results "is not only clearly erroneous, but it also results in a manifest injustice to WFS and the larger maritime and bulk oil and commodities industries." (Mot. at 1.) It argues that the "bunker sample testing clause at issue in this case embraces a particular dispute resolution mechanism that is ubiquitous to the maritime industry" and are

> intended to (1) avoid costly litigation (litigation that—in light of the technical aspects of these sorts of disputes—inevitably turns on who the fact finder concludes had the most believable and persuasive expert at trial), (2) resolve quality disputes in a more expeditious, efficient, and predictable manner, and (3) minimize the risk that the bunker seller or buyer will engage in fraud.

(Id. at 9-10.) It argues that "[i]f the fraud exception to the 'conclusive and binding' test result could be established simply by the presence of a conflict in test results, then the exception would completely swallow the rule." (Id. at 11.) Thus, it argues that "by inferring fraud simply from a conflict in test results, the Court's Order nullifies the bunker sample testing provision on which WFS and Omegra agreed and on which the bunker industry generally relies, thereby introducing instability, higher costs, and increased risk of fraud to these sorts of transactions." (Id.) Defendant further argues that although the Amended Complaint pleads facts that are consistent with the possibility of fraud, it does not plausibly allege fraud. (Id. at 11-12.) It further argues that the Court "has inadvertently created a jurisdictional split[,]" because—according to Defendant—"New York has

7

unequivocally held that a mere conflict in bunker sample test results is insufficient to infer fraud." (Id. at 13 (discussing Sempra Energy Trad. Corp. v. BP Prods N.A., 2007 WL 2175555 (N.Y. Sup. Ct. July 12, 2007), aff'd 860 N.Y.S.2d 71, 72 (N.Y. App. Div. 2008); Duferco, S.A. v. Tube City IMS, LLC, No. 10 Civ. 7377(JSR), 2011 WL 666365, at *2 (S.D.N.Y. Feb. 4, 2011)).) Defendant further argues that the Court's Order is at odds with the policy considerations of Rule 9(b). (Id. at 14-15.)

In its Response, Plaintiff argues that Defendant failed to establish a valid legal basis for reconsideration of the Court's Order; "Defendant simply just does not like the result." (D.E. 51 at 10.) It argues that the Court's Order "is completely in line with the Parties' Contract" and "is completely in line with well-established pleading requirements[.]" (Id. at 11.) It argues that Sempra Energy is inapposite, and the Duferco court "reached a conclusion much different than what Defendant alleged in its Motion." (Id. at 12-13.)

In its Reply, Defendant maintains that reconsideration is warranted for the reasons asserted in its Motion. (D.E. 52 at 2-6.)

"Courts have inherent authority to reconsider their prior non-final orders." Darby v. Carnival Corp., CASE NO. 19-21219-CIV-MORENO/GOODMAN, 2021 WL 5902866, at *2 (S.D. Fla. Dec. 13, 2021) (quoting Bell v. Ace Ins. Co. of the Midwest, Case No.: 2:20-cv-309-JLB-NPM, 2020 WL 7396934, at *1 (S.D. Fla. Dec. 17, 2020)). The general standards governing motions for reconsideration that are applied in this district have developed through case law:

> The "purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." Z.K. Marine Inc. v. M/V Archigetis, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992). In particular,

8

> there are three major grounds which justify reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice. See Offices Togolais Des Phosphates v. Mulberry Phosphates, Inc., 62 F. Supp. 2d 1316, 1331 (M.D. Fla. 1999); See also Sussman v. Salem, Saxon & Nielsen, P.A., 153 F.R.D. 689, 694 (M.D. Fla. 1994). In order to reconsider a judgment there must be a reason why the court should reconsider its prior decision, and the moving party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision. Sussman, 153 F.R.D. at 694. A "motion for reconsideration should not be used as a vehicle to present authorities available at the time of the first decision or to reiterate arguments previously made." Z.K. Marine Inc., 808 F. Supp. at 1563. Instead, a motion for reconsideration is appropriate where the "Court has patently misunderstood a party, or has made a decision outside of the adversarial issues presented to the Court by the parties, or has made an error not of reasoning, but of apprehension . . . . Such problems rarely arise and the motion to reconsider should be equally rare." Z.K. Marine Inc., 808 F. Supp. at 1563 (citing Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D. Va. 1983); Moog, Inc. v. United States, No. 90–215E, 1991 WL 255371, at *1, 1991 U.S. Dist. Lexis 17348, at *2 (W.D.N.Y. Nov. 21, 1991)).

Burger King Corp. v. Ashland Equities, Inc., 181 F. Supp. 2d 1366, 1369 (S.D. Fla. 2002). "Furthermore, reconsideration of a previous order is an extraordinary remedy to be employed sparingly." Id. at 1370 (citation omitted). "For reasons of policy, courts and litigants cannot be repeatedly called upon to backtrack through the paths of litigation which are often laced with close questions." Id. (citation omitted). Accordingly, motions for reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided." Grabein v. 1-800-Flowers.com, Inc., CASE NO.: 07-22235-CIV-HUCK, 2008 WL 11417701, at *1 (S.D. Fla. Mar. 12, 2008) (citing Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)).

Here, the Court finds that Defendant is simply seeking to relitigate an issue that the Court has already carefully considered and decided—specifically, whether the conflict in

9

bunker sample test results alleged in the Amended Complaint gives rise to a plausible inference of fraud such that (1) the Supplier Sample does not conclusively determine the quality of the Bunkers and (2) Count III states a claim upon which relief can be granted. (See Order at 12 (citing Curacao Oil N.V. v. Trafigura Pte. Ltd., 128 N.Y.S.3d 781 (Table), 2020 WL 3494685, at *5 (N.Y. Sup. Ct. Feb. 3, 2020) (finding that third-party's determination on marine fuel quality was final and binding under substantively identical contractual provision because the plaintiff did not allege fraud or manifest error)); id. at 25-26.) "[It is an improper use of] the motion to reconsider to ask the Court to rethink what the Court . . . already thought through—rightly or wrongly . . . ." Z.K. Marine, 808 F. Supp. at 1563 (citations omitted).

Despite Defendant's Doom's Day prediction that the Court's Order will negatively impact the entire global shipping industry, it has completely failed to show that the Court's Order was erroneous—much less clearly so[4]—and the Court is unpersuaded that it will result in a manifest injustice. Therefore, the Court denies the Motion to the extent it seeks reconsideration of the Order Granting in Part and Denying in Part the Motion to Dismiss the Amended Complaint.

      b.    **Certification of Interlocutory Appeal**

Defendant argues that if the Court finds that reconsideration is improper, it should "at least certify the following question for interlocutory appeal so that WFS can resolve this issue without further delay: **May fraud be inferred simply from a conflict in bunker**

---

[4] Although Defendant argues that a conflict in bunker sample test results can never trigger the fraud exception, it offers no other factual scenario that could trigger the fraud exception.

10

**sample test results?**" (Id. at 15.)  It argues that the question: (1) presents a pure question of law; (2) forms the basis for the entire remainder of Omegra's operative complaint such that it controls a 'substantial part of the case'"; (3) would be clearly identified in the Court's Order if the Court grants certification; (4) raises a jurisdictional split "at least between Florida and New York such that, if the Court does not reconsider the Order, there is facially 'substantial grounds for differences of opinion on the question[,]'" and (5) if answered in the negative, would reduce the amount of litigation on remand because Plaintiff would have no remaining viable claims.  (Id. at 16-17.)  Defendant further argues that there are several "compelling" policy reasons supporting certification, including that:

- "[T]he Court's Order will materially impact not just WFS and its numerous affiliate entities that rely on the same exact bunker sample testing clause at issue in this case, see ECF No. 28-1, but it will also adversely impact all other bunker merchants litigating in Florida—including those based in South Florida—and, in turn, the rest of the maritime industry." (Mot. at 17.)

- "[T]his issue regards a dispute resolution mechanism specifically intended to avoid litigation in a similar way as litigation immunity and arbitration.  If WFS needs to wait until the end of litigation for appellate review on the issue, then, it would render this litigation-avoidance mechanism meaningless." (Id. at 17-18 (citation omitted).)

- "[I]t is the policy of this jurisdiction to resolve threshold legal issues posed by a complaint before the parties engage in discovery, particularly regarding claims of fraud." (Id. at 18 (citations omitted).)

- "[G]iven that the Court's Order has resulted in a jurisdictional split that is favorable to plaintiffs, it will incentivize parties in bunker sale contracts to litigate these sorts of disputes here in the Southern District of Florida rather than, for example, in New York simply because of the Court's ruling. Minimizing such forum shopping is one of the many reasons that Congress authorized appellate courts to hear interlocutory appeals." (Id. (citations omitted).)

Thus, Defendant argues that if the Court declines to reconsider its Order, it should grant an interlocutory appeal.  (Id. at 19.)

Plaintiff argues that the Court should not certify an interlocutory appeal because: (1) Defendant's motion was untimely, (id. at 14-15); (2) an immediate appeal will not materially advance the ultimate termination of this litigation, (id. at 15-16); and (3) there are no compelling policy reasons supporting certification of an interlocutory appeal, (id. at 17-18).

In its Reply, Defendant maintains that if the Court declines to reconsider the Order, it should certify an interlocutory appeal.  (Id. at 6-9).  It argues that the motion to certify an interlocutory appeal was timely, (id. at 7-8), the question presented meets all the requirements for an interlocutory appeal, (id. at 8-9), and compelling policy reasons support certification of an interlocutory appeal, (id. at 9-10).

Title 28, United States Code, section 1292(b), provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

The Eleventh Circuit has noted that section "1292(b) appeals were intended, and should be reserved, for situations in which the court of appeals can rule on a pure, controlling question of law without having to delve beyond the surface of the record in order to determine the

facts." McFarlin v. Conseco Servs., LLC, 381 F.3d 1251, 1259 (11th Cir. 2004) (citations omitted).

Initially, the Court finds that the Motion to Certify an Interlocutory appeal is timely. Although Plaintiff appears to argue that Section 1292(b) requires a party to move the district court to certify an interlocutory appeal within ten days of the order being challenged, (Resp. at 14), the ten-day limitations period contained in Section 1292(b) applies to applications made to the Court of Appeals. 28 U.S.C. § 1292(b) ("The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order . . . ."). Here, the Court construes Defendant's Motion as requesting the Court to issue an Amended Order Granting in Part and Denying in Part the Motion to Dismiss the Amended Complaint with a certified question for interlocutory appeal. If the Court issues an Amended Order with a certified question, Defendants will have ten days under Section 1292(b) to apply to the Court of Appeals. Regardless, the instant Motion is not untimely.

The Court further finds that there is substantial ground for difference of opinion as to whether fraud may be inferred under the facts alleged in the Amended Complaint. However, the Court finds that the question that Defendant seeks to certify—"May fraud be inferred simply from a conflict in bunker sample test results?"—oversimplifies the issue. Instead, the Court will issue an Amended Order Granting in Part and Denying in Part the Motion to Dismiss the Amended Complaint which certifies the following question for interlocutory appeal:

13

> **"May fraud be inferred from a conflict in bunker sample test results where (a) four samples are tested, (b) three of the tested samples reveal that the bunkers are off-specification, and (c) the only sample that is on-specification is the sample that conclusively determines the quality of the bunkers?"**[5]

This question presents a pure question of law and is controlling of the remaining claims: if the Court of Appeals answers the question in the negative, neither the breach of contract claim (Count I) nor the fraud claim (Count III) survive. Thus, resolution of the question could reduce the amount of litigation necessary on remand—indeed, it could end the case.

### III. Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that:

1. Defendant's Motion for Reconsideration and, Alternatively, Certification for Interlocutory Appeal, (D.E. 47), is **GRANTED IN PART AND DENIED IN PART** consistent with this Order; and

---

[5] The more specific question is important because perhaps fraud cannot be inferred if only <u>two</u> samples are tested and there are conflicting results. On the other hand, fraud could likely be inferred if <u>100</u> samples are tested, 99 of them are off-specification, and the only one that is on-specification is the one that conclusively determines the quality of the bunkers (although Defendant appears to argue that fraud cannot be inferred even in that extreme scenario). This case falls somewhere in the middle.

2.     The Court will enter an Amended Order Granting in Part and Denying in Part Defendant's Motion to Dismiss the Amended Complaint which certifies the question as articulated above, and staying and administratively closing the case pending the Court of Appeals' decision.

**DONE AND ORDERED** in Chambers at Miami, Florida this 6th day of February, 2023.

*[signature]*
**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**