UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

OMEGRA SHIPPING PTE LTD OF
SINGAPORE,

                    Plaintiff,

      v.

WORLD FUEL SERVICES (Singapore) PTE
LTD,

                    Defendant.

Civil Action No. 2022-cv-20531


**ORAL ARGUMENT REQUESTED**


**DEFENDANT WORLD FUEL SERVICES' MOTION FOR SANCTIONS**

Defendant World Fuel Services (Singapore) Pte. Ltd. ("WFS" or "Defendant"), pursuant to Federal Rules of Civil Procedure 11 and 12(f), 28 U.S.C. § 1927, the Court's inherent authority to administer its docket, and the doctrine of judicial estoppel, moves for sanctions—including dismissal and assessment of fees—against Plaintiff Omegra Shipping Pte. Ltd. of Singapore ("Omegra" or "Plaintiff"), and Plaintiff's counsel. Omegra, through its counsel, has pursued claims regarding fraud in the Amended Complaint ("Complaint") (DE 4) based on material facts it knew to be untrue before it commenced this action. Omegra has since vexatiously prosecuted this case in an attempt to conceal from WFS and this Court that Omegra knew its claims are frivolous, thereby perpetrating a fraud upon WFS as well as the Court.

This motion is primarily based on the following material knowing misrepresentations made by Omegra: (1) that samples of fuel were collected at the time of delivery, were tested, and the results reflected that WFS delivered off-specification fuel while simultaneously Omegra pursued claims against the vessel owners in London arguing that the same fuel samples were not representative of the delivered fuel; and (2) that Omegra knew of no related proceedings to this action while Omegra itself litigated arbitration proceeding in London against the vessel owners where it is claiming a fuel sample it relies on in this case was not representative of the delivered fuel. Those—and other—statements were untrue, Omegra knew they were untrue, and under this Court's rulings, this action would have been dismissed had Omegra told the truth.

## PRELIMINARY STATEMENT

This action arises out of WFS' purported failure to provide on-specification fuel to a vessel pursuant to its contract with Omegra. Omegra claims that WFS not only breached the parties' contract but that, in doing so, it committed fraud.

In its Complaint as well as filings to this Court and the Eleventh Circuit, Omegra's reason for purportedly believing that WFS committed fraud was because (a) the fuel had been sampled at the time it was delivered to the vessel, (b) 4 of those samples were tested (the "VISWA," "AmSpec," "1st CCIC," and "2nd CCIC" samples), (c) 3 of those samples (the VISWA, 1st CCIC, and 2nd CCIC samples) were provided for testing by the vessel's owners, the results of which reflected off-specification fuel, (d) 1 of the samples (the AmSpec sample) was provided for testing by WFS' sub-contractor Sentek (the entity that sourced and physically delivered the fuel to the vessel), the results of which reflected on-specification fuel, and (e) the on-specification AmSpec sample was the controlling sample under the parties' contract. Omegra also alleged in its Complaint as well as argued to this Court and the Eleventh Circuit that the on-specification AmSpec sample was further suspect because its bottle was missing a counter-seal from the vessel. And in response to this Court's order directing the parties to disclose all related proceedings to this case, as well as in response to WFS' discovery requests regarding other proceedings between Omegra and the vessel owners, Omegra represented that there were "None."

This Court ultimately denied WFS' motion to dismiss and motion for reconsideration because it found that Omegra had plausibly alleged fraud in light of the 3-to-1 conflict in test results.

WFS has since learned that all of Omegra's above representations were false. Since before filing this lawsuit, Omegra knew that (and contrary to the implied suggestion in the Complaint) although Sentek delivered the fuel, Sentek was not allowed to physically board the vessel to take samples due to COVID restrictions. Instead, only Omegra's representative and the vessel's engineer were physically onboard, and it was the vessel's engineer that collected and sealed the samples. Moreover, Omegra's representative and the vessel's engineer were only supposed to, and

could only, collect 5 samples from a five-liter sampling container used as the source for the 5 samples. Nevertheless, the vessel's engineer somehow collected 9 samples: 5 samples using bottles, labels, and seals that Sentek provided and 4 additional samples using the vessel's own materials. The AmSpec and 2nd CCIC samples were in Sentek's bottles, and the VISWA and 1st CCIC samples were in the vessel's bottles. The vessel's engineer kept the VISWA, 1st CCIC, and 2nd CCIC samples, and they gave the AmSpec sample to Sentek.

Contrary to Omegra's representations to this Court and the Eleventh Circuit, although the vessel's engineer was supposed to place the vessel's seals on the 5 Sentek bottles (including the AmSpec and 2nd CCIC bottles), the engineer only placed the vessel's seals on the 4 vessel bottles (including the VISWA and 1st CCIC bottles). That is, Omegra's statements that WFS committed fraud as evidenced by the fact that the AmSpec bottle was missing the vessel's counter-seal was a clear misrepresentation because it knew the vessel's engineer had not countersealed the AmSpec bottle.

Further, before Omegra initiated this action, Omegra also initiated and is still litigating an arbitration against the vessel owners regarding the same facts that underlie Omegra's action against WFS. That is, Omegra's statements that there are no related proceedings to this action were also clear misrepresentations.

Far more critically, there is a reason Omegra concealed its arbitration from this Court and WFS. There, Omegra is seeking damages because Omegra discovered that the 2nd CCIC sample contained fuel that was not representative of the fuel that Sentek delivered. In other words, at the same time Omegra is pursuing a claim for fraud against WFS using the 2nd CCIC sample as evidence that the fuel delivered was off-specification in this case, it is pursuing claims against the vessel owners because it maintains the 2nd CCIC sample is not representative. And Omegra

separately discovered that the VISWA and 1st CCIC samples are not representative either, in part for the reasons discussed above regarding the vessel engineer's failure to properly collect (if not fraudulently create) those samples. That is, Omegra's statements that WFS committed fraud as evidenced by these 3 representative off-specification fuel samples were clear misrepresentations.

Moreover, Omegra made the above discoveries before it sued WFS such that these were knowing misrepresentations. And Omegra double-downed on its knowing misrepresentations even after this Court expressly held that the only reason Omegra alleged plausible causes of action was because of the 3-to-1 conflicting sample results.

Simply put, Omegra filed this action knowing that it was frivolous and made several misrepresentations to this Court, the Eleventh Circuit, and WFS to conceal that fact and prolong this action. Indeed, Omegra itself does not believe its own claims against WFS. At the deposition of Omegra's corporate representative, WFS asked Omegra about its allegations and claims of fraud. Omegra repeatedly said the same thing regarding what it knows and why it is making these claims against WFS: Omegra is simply relying on the advice of its P&I Club (its insurance carrier). That is, Omegra did not initiate this action because it genuinely wanted to seek redress and vindicate its rights. Rather, Omegra initiated this action because its insurance carrier told it to do so even though it knew the samples it would rely on to claim fraud were not representative of fuel quality, presumably in a misguided attempt to squeeze WFS for at least some settlement money and to position Omegra in a better posture against the vessel owners in their pending arbitration.

For these and other reasons discussed below, this motion should be granted and sanctions imposed on Omegra and its counsel.

## ARGUMENT

**I.      The Court Is Authorized To Assess Sanctions, Including Dismissal And Fees**

"The Court has a number of alternative sanctions, or combination of sanctions, at its disposal" to remedy frivolous, vexatious litigation. *Allapattah Servs. v. Exxon*, 372 F. Supp. 2d 1344, 1371 (S.D. Fla. 2005) (collecting authorities).

First, allegations in a pleading should be struck where they are "redundant, immaterial, impertinent, or scandalous[.]" Fed. R. Civ. P. 12(f). Such allegations should be struck to "avoid unnecessary time and money in litigating invalid and spurious issues," such as frivolous claims. *See Allapattah*, 372 F. Supp. 2d. at 1371 (collecting cases and noting Rule 12(f) is a "codification" of the court's "inherent power to manage pending litigation").

Second, Rule 11 sanctions should be awarded where a party files a factually groundless pleading or a potentially meritorious pleading that is nevertheless advanced in bad faith for an improper purpose. *Jones v. Int'l Riding Helmets, Ltd.,* 49 F.3d 692, 694 (11th Cir. 1995); *Diaz v. First Marblehead Corp.*, 643 F. App'x 916, 921 (11th Cir. 2016). The decision to impose Rule 11 sanctions involves a two-step inquiry: (1) whether the party's claims are objectively frivolous; and (2) whether the person who signed the pleadings should have been aware that they were frivolous. *Diaz,* 643 F. App'x at 921 (citations omitted). "Sanctions are [also] appropriate under Rule 11 when a party 'insist[s] upon a position after it is no longer tenable.'" *Woodhull v. Mascarella*, 699 F. App'x 872, 876 (11th Cir. 2017) (quoting *Peer v. Lewis*, 606 F.3d 1306, 1311 (11th Cir. 2010)).

Third, sanctions should be awarded where an attorney "unreasonably and vexatiously" engages in litigation tactics that "multiplies the proceedings[.]" 28 U.S.C. § 1927. That said, unlike other sanctions that may be levied against both clients and their attorneys, Section 1927 sanctions "may be imposed only against the offending attorney[.]" *Allapattah*, 372 F. Supp. 2d at 1372–73 (collecting cases).

Fourth, sanctions—including striking frivolous pleadings, dismissal, and assessment of fees—should be awarded under a "district court's inherent power" where a party or their attorneys "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Allapattah*, 372 F. Supp. 2d at 1373–74 (collecting Supreme Court and Eleventh Circuit cases). Specifically, the "key to unlocking a court's inherent power is a finding of bad faith." *Id.* (same). "Bad faith" exists where a "fraud has been practiced" upon the Court, or "where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order." *Id.* (same). The primary focus of the inquiry here is not on the "validity of the case" but, rather, on the "conduct and motive of a party[.]" *Id.* (quoting *Rothenberg v. Security Management*, 736 F.2d 1470, 1472 (11th Cir. 1984)).

Omegra should also be judicially estopped from asserting inconsistent or contradictory positions from those it "made under oath in a prior proceeding" that reflects the inconsistency was "calculated to make a mockery of the judicial system." *Allapattah*, 372 F. Supp. 2d at 1367–69 (collecting Supreme Court and Eleventh Circuit cases). Application of the judicial estoppel doctrine prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding. *Tolbert v. Mercedes-Benz U.S. Int'l Inc.*, 2018 WL 6046196, at *8 (N.D. Ala. Nov. 19, 2018) (quoting *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) overruled in part on other grounds by *Slater v. U.S. Steel Corp.*, 871 F.3d 1174 (11th Cir. 2017) (en banc)). The doctrine's purpose is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Vegas v. UPS Ground Freight, Inc.*, 2019 WL 13152026, at *2 (M.D. Fla. May 6, 2019) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)). Because judicial estoppel protects the process, not a specific party, the movant does not need to show that

it detrimentally relied on the other party's previous assertions or even that it was involved in the previous proceeding. *Burnes*, 291 F.3d at 1286.

Here, Omegra and its counsel should be sanctioned for commencing and vexatiously prosecuting this frivolous litigation, including striking the at-issue allegations, dismissal of this action, and assessment of fees. As discussed in more detail below, Omegra, through its counsel, has claimed that WFS committed *fraud* based on facts that it knows are untrue. Those facts are directly at odds with positions Omegra previously asserted against the vessel owners in still-pending arbitration proceedings, that Omegra had already discovered were untrue before commencing this action, and that Omegra always strongly believed were untrue since the vessel owners first claimed the at-issue fuel was off-specification. Then, after this Court ruled that Omegra's claims turned on those facts that Omegra knew were untrue, Omegra attempted to conceal and delay the discovery of those and other related facts, including by, among other things, misrepresenting to this Court and WFS that there are no related proceedings.

Omegra's tactics should not be endorsed and, instead, should be sanctioned. *See, e.g.*, *Allapattah*, 372 F. Supp. 2d at 1369–71 & 1374–76 (sanctioning and estopping party for taking contradictory positions in a way that reflected it was manipulating the judicial system, including in light of the party representing facts it knew were untrue, other facts it had "reason to believe" were untrue, engaging in litigation conduct that reflected it was "intentionally attempting to delay" proceedings, and having a motive to prolong the proceedings to gain an upper hand in related proceedings); *Burnes*, 291 F.3d at 1285-88; *Vegas*, 2019 WL 13152026 at *3-5; *Tolbert*, 2018 WL 6046196 at *8-9; *Weissenbach v. Tuscaloosa Cty. Sch. Sys.*, 2018 WL 5848047, at *13-15 (N.D. Ala. Nov. 8, 2018).

## II.     Omegra Misrepresented That The 3 Off-Spec Results Reflected The Fuel's Quality

In its Complaint, Omegra asserted numerous facts that it knew to be false (and which Omegra itself disputed elsewhere) in an attempt to support a general inference of fraud against WFS. Throughout this litigation, Omegra has argued that this Court can infer fraud because three of the four samples tested were off-specification. *See* DE 20 at 15. This Court agreed, concluding that the existence of 3 off-specification samples, as compared to just one on-specification sample, was sufficient to infer fraud (at least for purposes of surviving a motion to dismiss challenge). DE 43 at 26; DE 54 at 14. It specifically noted, however, the importance of the existence of <u>three</u> allegedly off-specification samples, and that the calculus might be different if the numbers of samples were different. In recognizing that "there is substantial ground for difference of opinion as to whether fraud may be inferred" based on conflicting test results, DE 54 at 13, this Court certified the following specific question to the Eleventh Circuit Court of Appeals:

> "May fraud be inferred from a conflict in bunker sample test results where (a) <u>four</u> samples are tested, (b) <u>three</u> of the tested samples reveal that the bunkers are off-specification, and (c) the only sample that is on-specification is the sample that conclusively determines the quality of the bunkers?"

*Id.* at 14 (emphasis added). In so doing, the Court added that "The more specific question is important because <u>perhaps fraud cannot be inferred</u> if only <u>two</u> samples are tested and there are conflicting results." *Id.* at 14 n.5. Clearly, fraud would be less inferable if there were one or no reliable samples that tested off-specification.

Omegra has consistently maintained to this Court that the three allegedly off-specification samples (the VISWA, 1st CCIC, and 2nd CCIC samples; *see* Complaint ¶¶ 14, 16, 17) represent the true quality of the fuel supplied to it by WFS (Complaint ¶ 18; DE 20 at 3; DE 51 at 4, 17), and that the one on-specification sample "came from a different source than the Bunkers supplied to the Vessel and collected by continuous drip at the Vessel's manifold as recorded in the Bunker

Delivery Note." Complaint ¶ 18; *see also* DE 20 at 3, DE 51 at 4. However, Omegra failed to inform this Court that "Charterers [i.e. Omegra] do not trust the results of [1st] CCIC and VISWALAB" (Exh. A at OMEGRA000128), or that "the source of the VISWA and [1st] CCIC samples are unknown" (Exh. B at OMEGRA000915.01), or that "the second CCIC sample is not representative of the fuel that World Fuel Services delivered to the vessel" (Exh. C at 194:3-5).

Omegra's corporate representative testified that it filed an arbitration action against the vessel owners (an action that is still ongoing) because of damages suffered when "the owners gave us the wrong sample for test – for testing." Exh. C at 187:3-5. When asked if it was one of the two samples tested by the CCIC lab, Omegra answered "Yeah, I think the second one." *Id.* at 187:25. When asked again if Omegra was "claiming that the owners in providing the second CCIC sample provided a – a sample that was not accurate," Omegra answered "Yeah. That was my understanding." *Id.* at 188:9-14. When asked "Is Omegra saying that that second – the the CCIC 2 sample was not representative of the fuel that World Fuel delivered to the vessel?", *id.* at 188:17-19, Omegra answered "Yeah. I understand from the lawyer." *Id.* at 188:20. Omegra was again asked a short time later "In your arbitration proceeding against the owners you have – you are taking the position that the second CCIC sample is not representative of the fuel that World Fuel Services delivered to the vessel, correct?", *id.* at 194:1-5, to which he again answered "Yeah." *Id.* at 194:6.

It is a fraud *on this Court* for Omegra to assert and maintain that the off-specification 2nd CCIC sample is reliable and representative of the fuel that WFS provided, and can contribute to this Court's ability to infer that WFS committed fraud against Omegra, while at the very same time, in a legal proceeding that it initiated against the vessel owners and that is still ongoing,

asserting and maintaining that the 2nd CCIC sample is <u>not</u> reliable and <u>not</u> representative of the fuel that WFS provided. This Court cannot allow or dismiss such duplicity and deceit.

Moreover, repeated and numerous communications between Omega and the vessel owners, and Omega's own assertions to the arbitration tribunal, show that Omega did not trust the veracity and reliability of either the VISWA or 1st CCIC samples either, in direct contradiction to its claims before this Court. Omega explicitly told the vessel owners that:

> "Charterers' Surveyor, who inspected the sampling, reported that the cubitainer used for collecting the drip sample from the vessel's manifold was with a capacity of five litres, and therefore, even if the cubitainer was filled after the continuous drip sampling process throughout the whole bunker delivery period, the filled cubitainer volume would be only sufficient to prepare the below listed five samples in the bunker supplier's provided sample bottles."

Exh. A at OMEGRA000127. Those five samples (with Sentek seals 4437251 through 4437255) do not include the VISWA or 1st CCIC samples. *Id.*; *see also* Exh. D at OMEGRA000011 (Bunker Delivery Note). Omega concluded that "it is questionable whether the following vessel's samples in Vessel's sample bottles were taken by continuous drip," and that "it appears that the vessel's samples were not sub-samples from the same cubitainer used for preparing the barge samples sealed with barge and surveyor seals." Exh. A at OMEGRA000128. These "vessel's samples" include both the VISWA and 1st CCIC samples. Omega's fuel consultant also agreed with all of these observations and conclusions. Exh. E at OMEGRA001340-1342. And Omega, in no uncertain terms, stated its position and conclusion: "<u>Charterers trust that this addresses Owners' question as to why **Charterers do not trust the results of CCIC[#1] and VISWALAB**</u>." Exh. A at OMEGRA000128 (emphasis added).

Omega again emphasized to the vessel owners that Omega's "surveyor that witnessed the sampling has confirmed that the Vessel's retained sample contained in the sample bottle delivered at CCIC [the 1st CCIC sample] **<u>is not the correct</u>** bottle that he left for the Vessel's retention"

(emphasis in original), and that "the Vessel's sample **is not representative of the samples collected by continuous drip**." Exh. A at OMEGRA000124 (emphasis added); *see also id.* at OMEGRA000122 ("the vessel's sample that was tested at CCIC **is not representative** of the Singapore bunkers on board") (emphasis added).

Omegra repeated all of these attestations to the arbitration tribunal, stating that "the supplier's sample [tested at AmSpec and showing on-specification results] was the one collected by way of continuous drip" and that "the source of the VISWA and CCIC samples are unknown" and citing and explaining the aforementioned reasons. Exh. B at OMEGRA000915.01 (emphasis added). In so doing, Omegra emphasized that neither the VISWA nor 1st CCIC samples were in bottles provided by Sentek as required (they were in the vessel's own unique bottles), neither had been countersealed by Omegra's surveyor (the 1st CCIC sample also lacked the Sentek seal), and neither was filled from the cubitainer that collected the continuous drip samples as required (with Omegra even emphasizing that Sentek's on-specification sample was properly collected). *Id.*; *see also* exh. B at OMEGRA000915.08-11; exh. E at OMEGRA001340-42; exh. A at OMEGRA000120, 122, 124-25.

This Court's conclusion that fraud could be inferred on the basis of conflicting test results depended on the reliability and representativeness of <u>three</u> off-specification samples as compared to only one on-specification sample. And in this proceeding, Omegra has maintained its assertions that all three of these off-specification results accurately represent the true fuel that Sentek delivered to the vessel. But, as discussed above, Omegra knew that those statements were not true.

Omegra's misrepresentations do not stop there. In attempting to paint a picture allowing for an inference of fraud, Omegra also has emphasized the fact that the sample bottle supplied by Sentek to AmSpec for testing did not contain a counterseal from the vessel, in contrast to what was

written on the Bunker Delivery Note. *See* Complaint ¶ 15; DE 51 at 17 ("the inference of fraud . . .

[also] came from the fact . . . that the sample used by Defendant was not counter sealed by the

vessel"); Exh. F (*World Fuel Services v. Omegra Shipping*, No. 23-90004 (11th Cir.), DE 12) at 19

(Omegra arguing same to Eleventh Circuit in interlocutory appeal petition opposition). However,

Omegra affirmatively knows that representation to not be truthful, as the vessel owners explicitly

informed Omegra on October 29, 2021 that the "Vessel did not counter sealed to barge's bunker

samples (5 bottles)." Exh. A at OMEGRA000135. Omegra itself fought back the very same

assertion by the vessel owners at arbitration, telling the arbitration panel on November 12, 2021:

> Owners' response also misrepresents the position with respect to the bunker
> supplier's sample that were tested in AmSpec. Owners knowingly did not place
> their own counter-seal on the bunker supplier's sample. This was admitted in
> correspondence by Owners and the authenticity of the supplier' sample was not
> called into question.

Exh. B at OMEGRA000915.03. To say the least, it is dishonest for Omegra to make the same false

attestations to this Court and the Eleventh Circuit in the hopes of furthering its inference of fraud.

These knowingly false and duplicitous assertions should be sanctioned and estopped.

Omegra cannot in one proceeding claim that the off-specification samples are inaccurate and not

representative of the fuel WFS provided (hoping to get appropriate damages), and in another legal

proceeding assert that the same samples are accurate and representative and use those assertions

to accuse WFS of fraud. In so doing, Omegra has itself committed a fraud upon this Court,

particularly in light of the tactical gamesmanship Omegra, through its counsel, has employed

throughout this lawsuit (discussed in more detail below).

## III.   **Omegra Misrepresented And Concealed The Existence Of Its Owner Arbitration**

On or about November 7, 2021, Omegra filed an Arbitration Notice and initiated an

arbitration proceeding in London against the vessel owners. Exh. A at OMEGRA000124. After

numerous exchanges, on or about November 11, 2021, the owners responded and gave their notice

of arbitration appointment to Omegra. *Id.* at OMEGRA000115. In the interim, Omegra and the owners had extensive discussions about why the filing of the Arbitration Notice was either necessary or pointless. *Id.* at OMEGRA000115-124. From the documents Omegra has provided, it appears Omegra sought, through this first arbitration action, an order requiring the vessel owners to permit Omegra to board the vessel and take a sample of the onboard bunkers. Exh. B at OMEGRA000915-915.12. Ultimately, the arbitration panel denied Omegra's request. Exh. G at OMEGRA000919.

Omegra also initiated a second arbitration proceeding against the owners. Omegra testified at its deposition that the second arbitration proceeding involves a claim by Omegra against the owners seeking damages for time loss because "the owners gave us the wrong sample for test – for testing." Exh. C at 187:3-5. According to Omegra, the owners provided a sample for testing (the 2nd CCIC sample) that was "not accurate" and "not representative of the fuel that World Fuel delivered to the vessel." *Id.* at 188:9-20. This arbitration proceeding is still active and ongoing, *id.* at 179:6, and unlike in the arbitration proceeding initiated on or about November 7, 2021, there have not been any rulings in this second arbitration suit. *Id.* at 190:1-3. Furthermore, Omegra commenced that proceeding "after de-bunkering" (*id.* at 185:19-20), which took place on November 22, 2021. Exh. H at OMEGRA000269.

On June 7, 2022, this Court ordered Omegra to file a Notice of Refiling and/or of Related Cases. DE 22 at 2. Omegra was expressly ordered to "specifically identify and describe . . . any action that concerns substantially similar factual allegations and legal issues." *Id.* at 3. Omegra necessarily should have divulged the existence of its arbitration proceedings against owners. It cannot be disputed that an arbitration action filed by Omegra against the vessel owners because of inaccurate, unrepresentative, and unreliable samples provided for testing by the owners, or an

14

arbitration action filed by Omegra against the owners for refusing to allow Omegra on board the vessel to test the quality of the fuel on the vessel (fuel provided by WFS), concern "substantially similar factual allegations and legal issues" to a lawsuit filed by Omegra against WFS alleging that those very same off-specification samples demonstrate that WFS committed fraud against Omegra by providing off-specification fuel, the very same fuel Omegra was refused allowance to test. Yet, unbelievably, Omegra vowed to this Court on June 22, 2022 that "it is not aware of . . . any other filing that concerns the same or substantially similar factual allegations and legal issues as are in the above-captioned case." DE 29.

In addition, Omegra also concealed the existence of the arbitration proceedings from WFS pursuant to various of its discovery requests. For example, request number 7 in WFS's First Request for Production of Documents sought documents and communications relating to "other claims and disputes made by Omegra, CIDO, and/or Owners over the quality of bunkers other [than] [sic] the instant dispute with WFS." Exh. I at 7. That request plainly covers the arbitration claims made by Omegra against the owners regarding the quality of the fuel on board the vessel and the reliability of the samples allegedly taken from the bunkers. On January 17, 2023, Omegra initially objected based, *inter alia*, on the request seeking "privileged communications and work product." Exh. J at 5. Later, however, on August 16, 2023, in their Amended Response to WFS's First Request For Production, Omegra simply responded "None" to RFP #7. Exh. K at 5. This concealing of its arbitration proceedings against the vessel owners from this Court and WFS also warrants the imposition of sanctions against Omegra and its counsel.

## IV.   Omegra Knowingly Filed And Prolonged This Frivolous Action Against WFS

The nature and context of Omegra's above-discussed misrepresentations themselves support imposition of sanctions. Omegra's bad faith knowingly frivolous action is only bolstered

by the several instances of gamesmanship and less-than-forthright tactics during litigation. *See,*
*e.g.*, DE 21 at 6 & n.1 (WFS discussing Omegra's reliance on clearly abrogated pleading standard);
DE 52 at 2–3 & n2 (WFS discussing Omegra's clear misrepresentations of WFS' arguments and
of this Court's ruling regarding the parties' contract). Indeed, the scope of Omegra's knowingly
frivolous claims (the complete extent of which is still concealed from WFS)[1] was not revealed
until the end of fact discovery after several conferral efforts, after WFS was forced to move to
compel when Omegra completely changed its discovery positions near the close of fact discovery,
and after WFS spent hours attempting to discover non-evasive information on noticed topics at
Omegra's 30(b)(6) deposition just 3 days before the close of fact discovery. *See generally* DE 70
(WFS discussing Omegra's close-of-discovery, post motion-to-compel document dump, its
continued withholding of materials, clear misrepresentations regarding the size of WFS' own
document productions, and blatant misrepresentations that it advanced objections to producing
***arbitration materials***); Exh. C (deposition of Omegra's 30(b)(6) and key fact witness).

For example, Omegra accused WFS of committing fraud by "providing a sample of marine
fuel for testing that was not from the off-spec marine fuel that it sold Omegra." DE 4 ¶ 42. WFS
provided this sample to AmSpec for testing on October 27, 2021, and the results showed the fuel
to be on-specification. Exh. D at OMEGRA000001. This sample bottle was sealed with Sentek's
seal no. 4437253 and Omegra's surveyor's seal no. 038233, with a label from Sentek containing
the stamp of the vessel's engineer along with the signatures of the engineer and Omegra's surveyor,
as well as the surveyor's label containing the engineer's and surveyor's stamps and signatures. *Id.*;

---

[1] In response to WFS' motion to compel (which included materials regarding Omegra's
arbitration), Omegra successfully portrayed itself as having produced all remaining documents (it
has not) and WFS as having not conferred in good faith (it did). DE 72. WFS respectfully disagrees
with Judge Louis' holding. Regardless, WFS did not discover Omegra's misrepresentations at
issue in this Motion until briefing closed on its motion to compel.

Exh. L at WFS-0000060. All of these were identical to the seals, labels, signatures, and stamps on the bottle provided by the vessel's engineer and Omegra's surveyor to Sentek on September 24, 2021 after they had taken the sample from the fuel provided to the vessel by Sentek. Exh. D at OMEGRA000006–7. As all parties acknowledge, because of Singapore Marine Port Authority regulations due to COVID-19, Sentek had no presence on board the vessel and did not participate in any way in the sampling of the fuel or the sealing of the bottles. *Id.* at OMEGRA000007.

Omegra has not once explained how WFS (or Sentek) provided to AmSpec a second bottle of fuel different from the bottle of fuel provided to Sentek by the vessel's engineer and Omegra's surveyor after sampling. Omegra has not provided any details as to how WFS was able to obtain a duplicate surveyor's label, or how it could get the engineer's and surveyor's stamps and signatures on it. Nor has Omegra explained how WFS could obtain the engineer's and surveyor's signatures or the engineer's stamp on a supposedly duplicate Sentek label. And Omegra hasn't provided any details as to how WFS was able to obtain duplicate seals from Sentek and Omegra's surveyor, or why neither the vessel owners nor Omegra's representatives objected to the sample bottle provided by Sentek to AmSpec at the time of testing, despite having physically inspected the sample bottle at that time.

Nor, unsurprisingly, has Omegra alternatively explained how, if the two bottles were the same, the sealed bottle when provided to AmSpec for testing could contain different fuel from the fuel provided to the vessel by Sentek, seeing as how it was the vessel's engineer and Omegra's own surveyor who took the fuel sample onboard the vessel in the first place (from fuel provided to the vessel by Sentek), sealed the bottle, and provided the bottle to Sentek.

Omegra and its counsel are required to, among other things, ensure that every factual contention has evidentiary support or will likely have evidentiary support after discovery is

conducted. *See, e.g.*, Fed. R. Civ. P. 11(b)(2), (3). And when deposed at the conclusion of fact discovery and directed to testify regarding the factual bases supporting Omegra's accusation of fraud against WFS, Omegra itself was unable to point to or identify any facts supporting the allegation. Instead, when asked to explain the basis for "Omegra's claiming that World Fuel committed fraud against it," Exh. C at 199:24-25, Omegra answered that it was the position of their P&I (Protection and Indemnity Insurance) Club, *id.* at 200:1. When asked if that was also Omegra's position, Omegra stated "We follow the Club's advice." *Id.* at 200:2-3. When specifically asked as clarification "what exactly is it that you are claiming World Fuel did that defrauded Omegra?", Omegra again stated "we just simply follow [] the Club's advice. We follow whatever position the Club takes." *Id.* at 200:11-19. When Omegra was directed to paragraph 18 of the Complaint and asked to explain how Omegra concluded that the sample provided by Sentek for testing came from a different source than the fuel provided to the vessel, all Omegra could say was that it was "[a]dvised by the Club," that "I pretty much depend on the Club's investigation and based on the [Club's] information," and that "Omegra's knowledge is basically depend on the Club's advice and investigation." *Id.* at 202:5-22.

Omegra was directly asked to confirm these statements: "Are you saying Omegra does not have any – any position as to how – does not know how World Fuel or Sentek committed fraud here?" *id.* at 203:11-13, to which Omegra could only reply "we rely very much on the Club's expertise," *id.* at 203:17-18. And when Omegra was asked whether Omegra believes paragraph 42 of the Complaint (where Omegra specifically accuses WFS of fraud) to be accurate, Omegra again dodged, saying "As far as the Club's concerned, yeah, that would be our position," *id.* at 210:6-12, and "As far as the Club, this is the focus we take from the Club," *id.* at 211:7-8.

When Omegra was asked if it was treating "Omegra" and its "P&I Club" as synonymous (even though the deponent admitted he was testifying as Omegra's corporate representative and not on behalf of the Club, *id.* at 211:10-13), Omegra directly answered "No." *Id.* at 211:15-17. Omegra was then given ***another chance*** to explain "what specifically – specifically does Omegra claim happened that led to a – to fraud?" *Id.* at 211:22-24. Omegra was ***still unable*** to provide a single fact or any basis upon which Omegra accused WFS of fraud, answering "I can't remember. I – I just go along what the Club -- Omegra -- what the Club's advice." *Id.* at 212:2-4. Omegra was then asked ***again*** what basis Omegra had for making its allegation of fraud against WFS, *id.* at 212:6-9, to which Omegra could only answer "the Club's advice." *Id.* at 212:11. Omegra was then specifically asked point blank "Does Omegra have any – any factual basis to support that conclusion [of fraud]?" *Id.* at 212:13-14. And, as before and throughout, all Omegra could say was that "we always – we just depend on the Club's advice." *Id.* at 212:16-17.

From the beginning, and throughout this litigation, Omegra has failed and refused to provide a single substantive fact supporting its allegation of fraud against WFS. As explained in the section above, Omegra successfully painted a general story from which this Court drew a general inference of fraud based on facts that Omegra itself knew and believed were untrue all while misrepresenting and omitting facts that overwhelmingly corroborate the veracity of the on-specification AmSpec sample. That is, Omegra did not file this action because it had reason to believe WFS defrauded it. Rather, Omegra filed this action because its P&I Club told it to do so, presumably in a misguided attempt to squeeze WFS for settlement money and position Omegra in a better posture against the vessel owners in their pending arbitration.

**CONCLUSION**

Omegra's illegal and unethical conduct should not be tolerated. It is appropriate, and indeed necessary, for this Court to protect the integrity of the judicial process by sanctioning Omegra and its counsel, including dismissing the Complaint and awarding fees, and grant any other relief that this Honorable Court deems just, equitable, and proper.

**Compliance with Federal Rule of Civil Procedure 11(c)(2)**

In accordance with Federal Rule of Civil Procedure 11(c)(2), undersigned counsel certifies that it served this Motion on Plaintiff, via Plaintiff's counsel, on October 24, 2023. Plaintiff did not withdraw its Complaint within 21 days after service; therefore, WFS now files this Motion for presentation to the Court.

**Certificate of Conferral Under Local Rule 7.1(a)(3)**

In accordance with Local Rule 7.1(a)(3), undersigned counsel certifies that it, in connection with serving this Motion on October 24, 2023, undersigned counsel sought to meet and confer with opposing counsel both by phone and email regarding the issues and relief sought.

**Request For Hearing**

Pursuant to Local Rule 7.1(b)(2), defendant WFS respectfully requests oral argument on this motion for sanctions. Given the dispositive nature of this motion and gravity of Omegra's at-issue actions, WFS believes oral argument would assist the Court in more efficiently resolving the parties' dispute. WFS suggests that the Court set aside 45 minutes for the hearing.

Dated:   November 15, 2023

Respectfully submitted,

**HOLLAND & KNIGHT LLP**
By: /s/ *Adolfo E. Jiménez*
Adolfo E. Jimenez
Florida Bar No. 869295

Gabriel Godoy-Dalmau
Florida Bar No. 1036181
Douglas Lehtinen
Florida Bar No. 0126452
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: (305) 789-7720
Adolfo.Jimenez@hklaw.com
Gabriel.Godoy-Dalmau@hklaw.com
Douglas.Lehtinen@hklaw.com

Robert Denig (admitted pro hac vice)
31 W. 52nd St. 12th Fl.
New York, NY 10019
Telephone: (212) 513-3200
Robert.Denig@hklaw.com

*Attorneys for Defendant*
*World Fuel Services (Singapore) PTE LTD*